UNITED STATES of America, Plaintiff,

v.

Frank Peter BALISTRIERI, Steve Di Salvo, Salvatore Anthony Librizzi, Dennis Librizzi, and Carl Micelli, Defendants.

No. 81–CR–152.

United States District Court, E.D. Wisconsin.

Jan. 19, 1984.

Supplemental Opinion Jan. 20, 1984.

John Franke and Mark Vogel, U.S. Dept. of Justice, Organized Crime and Racketeering Section, Milwaukee, Wis., for plaintiff.

John Tucker, Jenner & Block, Chicago, Ill., for Balistrieri.

John Murray, Milwaukee, Wis., for Di Salvo.

Stephen Glynn, Shellow, Shellow & Glynn, Milwaukee, Wis., for S. Librizzi.

Robert Sutton, Sutton & Kelly, Milwaukee, Wis., for D. Librizzi.

Richard Surges, Milwaukee, Wis., for Micelli.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

The trial in this case started on August 29, 1983. It proceeded on an 11-count In-

dictment that named seven defendants. Count 1 of the Indictment charged a conspiracy to violate federal gambling laws between September 1, 1977 and April 18, 1980. Counts 2, 3, and 4 charged substantive gambling violations relating to the 1977 football season (Count 2), the 1979 football season (Count 3), and the 1980 basketball season (Count 4). The remaining counts alleged various tax violations relating to the charged gambling operations. The trial concluded on October 9, 1983, when the jury returned mixed verdicts of guilty and not guilty.

Two former defendants, Peter Picciurro and John Piscuine, were acquitted on all charges. The remaining five defendants were convicted of various offenses. Frank Balistrieri was convicted on Counts 1, 2, 3, 5, and 7. He was acquitted on Counts 4, 8, 9, 10 and 11. Steve DiSalvo was convicted on Counts 1 and 2, and acquitted on Count 3. The charges against DiSalvo on Count 4 were dismissed by me before the case went to the jury. Sam Librizzi, who was charged in 10 of the 11 counts of the Indictment (he was not charged in Count 6), was convicted on all counts except Count 8. The other two defendants, Dennis Librizzi and Carl Micelli, were convicted on all counts that named them. Dennis Librizzi's convictions were on Counts 1, 4, 6, 10, and 11. Micelli's convictions were on Counts 2, 3, and 4.

A multitude of post-trial motions have been filed by the defendants. All defendants have moved for the entry of a judgment of acquittal [1] and, alternatively, for a new trial [2]. Frank Balistrieri has moved for an order scheduling a hearing with respect to the jury's verdict on Count 2. He also requests that oral argument be scheduled on the various motions. In addition, some of the defendants have moved to adopt the motions filed by others. The latter motion is granted. The motion regarding oral argument is denied. The oth-er motions will be discussed in this decision. The decision is subdivided and the issues discussed as follows:

A. Motions for Judgment of Acquittal .......... Page 1535

 1. General Discussion ................... 1536

 2. Count 2 – 1977 Football Season ........ 1536

 3. Count 3 – 1979 Football Season ........ 1539

 4. Count 4 – 1980 Basketball Season ...... 1542

 5. Count 1 – Conspiracy ................ 1543

 6. Wagering Tax Counts, 5 to 11 ......... 1544

B. Motions for A New Trial ................... 1545

C. Motions Relating to Jury "Communications" and Motion for Evidentiary Hearing Regarding Jury Verdict on Count Two ................ 1547

D. Sentencing ............................. 1551

## MOTIONS FOR JUDGMENTS OF ACQUITTAL

The defendants have each filed motions pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, seeking judgments of acquittal as to all counts on which the jury found them guilty. The primary thrust of these motions is that the evidence was insufficient to support the verdicts. The motions are denied.

 In passing upon motions seeking the entry of judgments of acquittal after a trial, I must apply the following standard:

The rule has long been established that when ruling on a motion for acquittal the test that the court must use is whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the Government ... bear[ing] in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences."

*United States v. Beck,* 615 F.2d 441, 447–8 (7th Cir.1980) and *United States v. Weed,* 689 F.2d 752, 756 (7th Cir.1982). A judgment of acquittal may not be granted mere-

---

**1.** In his enthusiasm for setting aside convictions, counsel for Sam Librizzi has even moved for judgment of acquittal on Count 8, the only count that Librizzi was found not guilty on by the jury.

**2.** The government objects to Micelli's motions, claiming they are untimely. Because the practice has been followed in this case of allowing one defendant to adopt the motions filed by others, I overrule the government's objection and consider Micelli's motions on their merits.

ly because the jury may have reached allegedly inconsistent verdicts. Consistent verdicts are not required. *United States v. Beck, supra; United States v. Niemiec,* 611 F.2d 1207, 1210 (7th Cir.1980). Moreover, "because it is the jury's special province to weigh conflicting testimony, determine credibility and draw factual inferences, a motion for acquittal after a jury verdict of guilty may be granted only when the relevant evidence is insufficient to prove all the elements of the charged offense." *United States v. Beck, supra.* Application of these standards to the present motions reveals their complete lack of merit. A recitation of the evidence supporting the jury's verdicts of guilt as to each count follows. All of the evidence recounted below could have been believed by the jury and for that reason, the convictions must stand.

## COUNT 2—1977 FOOTBALL

Viewing the evidence in the light most favorable to the government, it established that the defendant Salvatore Librizzi, known to all as "Sam", conducted and managed an illegal sports bookmaking business during the 1977 football season. The evidence established that this business accepted $6,710 in wagers on December 23, 1977, $11,090 in wagers on December 24, 1977, $1,850 in wagers on December 25, 1977, and $12,060 in wagers on December 26, 1977 (tape recorded conversations involving Sam Librizzi and others during the period December 23, 1977 through January 2, 1978). The composite tape recordings of intercepted conversations between December 23, 1977 and January 2, 1978, and the expert testimony of Special Agent William L. Holmes [3] of the FBI further established that at least eight other persons identified as writers or agents (excluding John Piscuine who was acquitted on Count 2) assisted Librizzi in conducting the day-to-day affairs of the business. One of the writers was the defendant Carl Micelli. The writers received instructions and line information from Librizzi, accepted wagers from customers in accordance with the instructions and line information, and relayed all or a portion of the wagers received back to Sam Librizzi. The evidence together with Agent Holmes' testimony, also established that an individual named Richard Panella

---

**3.** Agent Holmes was qualified in this case as an expert on gambling. He gave extensive testimony and offered numerous opinions based on his review of such things as taped telephone gambling conversations, recovered bet slips and tally sheets. Although I found him to be an impressive witness, his testimony at one point provided a light moment in this long trial. On September 22, 1983, while being examined by Robert Sutton, counsel for Dennis Librizzi, the following occurred:

"Q Well, was Jimmy the Greek Schneider ever a bookmaker ever in his life, to your knowledge?

A Yes, sir, he was.

Q And Pete Axthelm gives the line on the other station, doesn't he?

A I just told you, I don't know.

Q Well, you're a sports book gambling expert, Mr. Holmes.

A My expertise lies in examination of records and interpretation of conversations of bookmaking operations. I'm not an encyclopedia of all sports trivia.

Q Do you know when they play the Rose Bowl?

A Pardon?

Q Do you know what day of the year they play the Rose Bowl?

A No, sir. I believe it's the 26th.

Q You're kidding me?

A I told you I wasn't sure.

Q Do you know when they play the Orange Bowl?

A No.

Q Do you know when they play the Sugar Bowl?

A They're all in December.

MR. SUTTON: I couldn't possibly get any better than that. I have nothing more."

Perhaps it was a simple faux pas, perhaps it was merely the response of a tired witness who had been on the stand for several days, or perhaps the FBI's gambling expert really didn't know that the Rose Bowl (along with the Orange, Sugar and, for that matter, the Cotton Bowl) is always (except, ironically, this year, when it was played on January 2 to avoid a Sunday clash with the pro football playoffs) played on New Year's Day. To sports fans in the courtroom, including myself, the possibility that the FBI gambling expert didn't know when the Rose Bowl is played seemed rather peculiar and a little comical. At any rate, after giving his answer, Holmes was dubbed "Rose Bowl Holmes" by Mr. Sutton, a moniker that all of the defense attorneys adopted and used in closing argument to try and make Holmes, and his entire testimony, appear to be unbelievable.

acted as an agent or "beard" for the operation by placing or attempting to place lay-off wagers with an unknown individual identified as Tony. Each of these eight individuals were more than mere bettors, and each performed functions necessary to the illegal gambling operation. Thus, as a matter of law, each could be found to have conducted a gambling business as charged within the meaning of 18 U.S.C. § 1955. See, e.g., *Sanabria v. United States,* 437 U.S. 54, 70 n. 26, 98 S.Ct. 2170, 2182 n. 26, 57 L.Ed.2d 43 (1978); *United States v. McHale,* 495 F.2d 15, 18 (7th Cir.1974); *United States v. Hunter,* 478 F.2d 1019, 1022 (7th Cir.), *cert. denied,* 414 U.S. 957, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973).

■ Recently, in *United States v. Greco,* 619 F.2d 635, 638 (7th Cir.1980), the Court of Appeals for the Seventh Circuit defined the term "conduct" as meaning:

[T]o perform any act, function or duty which is necessary to or helpful in the ordinary operation of the business, and ... a person may be found to conduct a gambling business even though he is a *mere servant* or employee having no part in the management or control of the business *and no share in the profits,* but ... a mere bettor or customer of a gambling business cannot be said to conduct the business. [Emphasis added.]

While a commission or some other indication of compensation or a share in the profits of a gambling business is evidence to be considered in determining whether an individual is conducting that business within the meaning of 18 U.S.C. § 1955 [4], it is not a necessary prerequisite before one can be found to have conducted an illegal gambling business under § 1955.

■ The evidence linking defendants Balistrieri and Di Salvo to this 1977 bookmaking operation, evidence that the jury was fully entitled to believe, is strong [5]. On August 25, 1978, Special Agents Gail T. Cobb and Joseph Pistone of the FBI, acting

in undercover capacities, and Benjamin Ruggiero (whom Balistrieri's attorney described as "a cheap two-bit hoodlum from New York" in his opening statement, Tr. p. 93) went to Snug's Restaurant in Milwaukee, where they observed Balistrieri seated at a table with Di Salvo and others. Balistrieri motioned Ruggiero over to his table, and Cobb and Pistone remained in the bar area. After about 20 minutes, Cobb and Pistone were escorted to Balistrieri's table and Pistone was introduced to Balistrieri and Di Salvo. After this meeting, Ruggiero told Cobb and Pistone what Balistrieri had said to him before they were escorted to his table. Ruggiero's statements were recorded en route from Snug's to the Midway Motor Lodge in Agent Cobb's automobile. In this recorded conversation, received in evidence during the trial, Ruggiero repeated in substance that Frank Balistrieri had told him that football was the biggest thing in Milwaukee and that he (Balistrieri) had his own "office" which he wanted to discuss with Ruggiero and Pistone. Agent Pistone, experienced in these matters, understood Balistrieri's reference to "office" to mean that Balistrieri had his own bookmaking operation.

Late the next evening, at the Peppercorn Restaurant in Milwaukee, Balistrieri and Di Salvo revealed their roles as owner and manager respectively of the gambling business operated by Sam Librizzi in 1977. This conversation began with a discussion between Pistone and Di Salvo concerning the upcoming football season and bookmaking in general. As the conversation proceeded, Di Salvo advised Pistone in the presence of Cobb, Balistrieri, and Ruggiero, that he was the one who handled Balistrieri's sports bookmaking operation, that he wanted to get out of it, and that he was trying to talk Balistrieri out of the bookmaking business. The reason given by Di Salvo was that most of the bookmakers in Milwaukee were "stool pigeons" and he

---

**4.** As Agent Holmes testified, the evidence disclosed that defendant Carl Micelli, Eugene Kawczynski and Joe Zizzo had an arrangement with the Librizzi operation in 1977 whereby they kept a portion of the wagers that they accepted and relayed the balance to Librizzi.

**5.** Defendant Balistrieri relies on the fact that Agent Holmes did not identify him as one of the participants in the 1977 football bookmaking operation. However, as Agent Holmes testified, he did not consider the undercover investigation in arriving at his opinions.

was attempting to convince Balistrieri to charge the other bookmakers in Milwaukee $1,000 a week in order to operate. In this way, Di Salvo explained, the bookmakers would be prevented by their own illegal activities from going to the FBI. Di Salvo further stated that there were so many stool pigeons in Milwaukee that they would need "Castro's army to kill all the stool pigeons that Milwaukee had." At this point in the conversation, Balistrieri confirmed that Di Salvo was in charge of his bookmaking operation and that he "Was looking for an individual to oversee the day-to-day operation, because the person that was running it last year, by the name of Sam, did not tend to business and wasn't doing a good job and he was looking for someone he could trust to run the daily, the day-to-day operation for the upcoming football season." Balistrieri further advised that they wanted somebody to take over this gambling operation from Sam, "so Steve wouldn't have to spend so much time taking care of the book."

After Frank Balistrieri announced that they were looking for someone to replace "Sam", Ruggiero volunteered Pistone's services to take over the day-to-day handling of Balistrieri's bookmaking operation. Pistone concurred in Ruggiero's offer. At that point, Balistrieri took Ruggiero aside and spoke with him out of the presence of Agents Pistone and Cobb. Although Cobb was only able to hear brief portions of this conversation to the effect that Balistrieri would have to call New York and that he (Balistrieri) was holding Ruggiero responsible, the full substance of this conversation was later revealed by Ruggiero to Cobb and Pistone in a tape recorded conversation in the early morning hours of August 28, 1978, after the trio left the Peppercorn. The tape recording of this conversation, Government's Exhibit 202A, was played for the jury. It corroborated the testimony of Cobb and Pistone in every respect and further established that Balistrieri owned a bookmaking business and was interested in having Pistone take over the handling of its day-to-day operations.

After Balistrieri and Ruggiero concluded their private discussion at the Peppercorn, they returned to the area where Pistone and Cobb were standing and Balistrieri, in Di Salvo's presence, advised Pistone to contact Di Salvo and make arrangements to meet with him to go over their bookmaking operation. At this point, Di Salvo agreed that Pistone should contact him to set up a meeting for Tuesday.

On the evening of August 28, 1978, at Ruggiero's direction, Cobb made arrangements to meet with Balistrieri to advise him that Pistone would not be taking over the bookmaking operation. Upon learning of this fact from Cobb, Balistrieri said he would have to make some other kind of arrangements to replace "the guy that had it". This statement indicated Balistrieri's continuing intent to run his sports bookmaking business during the 1978 football season.

The admissions of Balistrieri and Di Salvo concerning their roles in Balistrieri's bookmaking operation as well as Balistrieri's statements related by Ruggiero, were corroborated by testimony detailing a series of surveillances conducted by the FBI in October of 1976. These surveillances established that the "Sam" mentioned by Balistrieri and Di Salvo on August 27, 1978 was, in fact, Sam Librizzi. This evidence, predating the time frame alleged in the Indictment, was admitted into evidence to prove the defendants' association, purpose, and the nature of their plan. See Rule 404(b), Federal Rules of Evidence; *United States v. Hickey*, 360 F.2d 127, 139–140 (7th Cir.1966); *United States v. Cioffi*, 493 F.2d 1111, 1115 (2d Cir.), *cert. denied*, 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974).

On October 2, 1976, (during the 1976 football season), FBI agents observed Sam Librizzi meet with Di Salvo in the parking lot of St. Michael's Hospital. When they were observed, Librizzi had the trunk of his vehicle open and both were standing at the rear of the vehicle talking. Photographs were taken of them on this occasion. Later on October 2, 1976, after Librizzi and Di Salvo left the St. Michael Hospital parking lot, Di Salvo was observed going to Frank Balistrieri's house

and then leaving a short while later. On September 13, 1978, Agent Cobb met with Frank Balistrieri, Steve Di Salvo, Peter Balistrieri, and Joe and John Balistrieri at Snug's. Peter and Frank Balistrieri had just returned from a federal grand jury appearance. Cobb heard Peter Balistrieri tell Di Salvo, "You got a problem." Frank Balistrieri then told Di Salvo that the government had pictures of Di Salvo meeting Sam Librizzi, "At the hospital ... where you picked up the money." In discussing this matter with Di Salvo, Frank Balistrieri referred to Sam Librizzi by his full name. As the parties have stipulated in this case, on September 13, 1978, Frank Balistrieri was shown photographs of the October 2, 1976 surveillance by government attorney J. Kenneth Lowrie. These photographs were received in evidence at trial. Balistrieri's statements to Di Salvo on September 13, 1978 give rise to the reasonable inference that on October 2, 1976 Di Salvo picked up money from Sam Librizzi and delivered it to Balistrieri. It is also reasonable to infer that the money was generated by the Librizzi bookmaking operation.

On October 3, 1976, agents of the FBI observed Di Salvo again meeting with Sam Librizzi in the parking lot of St. Michael's. Di Salvo was at the lot when Librizzi arrived. Upon arriving, Librizzi got into Di Salvo's car. The two were observed discussing something in Di Salvo's auto for approximately 10 minutes. On October 4, 1976, agents again observed Librizzi meet with Di Salvo at the hospital parking lot. On this occasion, Di Salvo got into Librizzi's car for a short period of time and then both got out and stood alongside the vehicle. The meeting lasted approximately four minutes, and during it Di Salvo was gesturing in a forceful manner and speaking in a very loud voice. On this occasion, Librizzi said little or nothing, and was observed shrugging his shoulders. Di Salvo's actions on this occasion give rise to the inference that he was Librizzi's boss and that he was angry with Librizzi. When viewed together with the other evidence, the jury could reasonably have found that Di Salvo was scolding Librizzi for something he had or had not done with respect to their gambling operation.

When viewed in the light most favorable to the government, all of this evidence demonstrated Frank Balistrieri's ownership of the Librizzi bookmaking operation and Steve Di Salvo's role in it during the 1977 football season. Thus, the evidence established at least eight other individuals plus Balistrieri, Di Salvo, Carl Micelli, and Sam Librizzi conducted, managed, and controlled the illegal bookmaking business charged in Count 2 in violation of 18 U.S.C. § 1955. Accordingly, there is no basis for overturning the jury's verdicts finding these defendants guilty as charged on Count 2 of the Indictment. The motion for judgment of acquittal on Count 2 is denied.

### COUNT 3—1979 FOOTBALL

The evidence, again viewed in the light most favorable to the government, is also sufficient to support the convictions of Balistrieri, Micelli, and Sam Librizzi on Count 3 of the Indictment. This evidence indicated that virtually the same bookmaking business in operation in prior and subsequent years was also in operation during the 1979 football season[6]. On March 5, 1980, the FBI seized Government's Exhibits 2, 3, and 4 from Frank Balistrieri's

---

6. The continuity of this illegal gambling business is suggested by the following evidence and inferences. As detailed above with respect to the 1977 bookmaking operation charged in Count 2, statements made by Balistrieri and Di Salvo in the "Peppercorn conversation" and the FBI surveillances of Di Salvo and Librizzi in October, 1976, give rise to the reasonable inference that similar bookmaking operations were conducted by the defendants Balistrieri, Di Salvo and Sam Librizzi during the 1976 and 1978 football seasons. A review of Government's Exhibit T-106 further supports the inference of a

similar operation during the 1978 football and 1979 basketball seasons. Government's Exhibits 6 through 10, which were "bottom sheets" in the handwriting of Sam Librizzi seized from Frank Balistrieri's bedroom on March 5, 1980, reflect wagering activity by various account designations. Although Agent Holmes was unable to date these records, he testified that a review of the account designations listed on them demonstrated an interrelationship between the 1977 bookmaking operation charged in Count 2 and the 1980 basketball bookmaking operation charged in Count 4, in that many of the account

bedroom in his residence on North Shepard Avenue in Milwaukee. Most of these documents were in the handwriting of Sam Librizzi (Stipulation No. III). They reflected wagering activity on football games played on October 13, 1979 (Government's Exhibit 3), on October 14, 1979 (Government's Exhibit 2 and 4), and on October 15, 1979 (Government's Exhibit 2). Agent Holmes identified Government's Exhibit 2 as a "charting sheet" which someone in a managerial position of a gambling business would possess and utilize to gauge the amount of wagering activity and to determine whether layoffs or line changes should be made. Government's Exhibits 3 and 4 were identified as "bet slips" bearing the account designation "JP". Holmes testified that an individual in possession of Government's Exhibits 2, 3, and 4 would occupy a managerial role in the gambling business reflected by them. He further testified that these records related to the acceptance of wagers by the *same* gambling business. In addition to Exhibits 2, 3, and 4, Holmes listened to an intercepted conversation between Frank Balistrieri and Sam Librizzi that took place on January 10,

1980 (See Government's Exhibit T–106 and Defendant's Exhibit 106). Holmes found that in portions of this conversation, Librizzi was reporting to Balistrieri concerning wagering activity conducted during the previous football season. Holmes also had occasion to review an intercepted telephone conversation between Sam Librizzi and John Piscuine on October 25, 1979. Based upon this conversation, Government's Exhibit T–106, and upon Government's Exhibits 2, 3, and 4, Holmes testified that Frank Balistrieri was an owner, manager or partner in the illegal gambling business reflected by this evidence, and that Sam Librizzi occupied a managerial role in this business. Two additional intercepted conversations not considered by Holmes, Government's Exhibits 102 and 104A, further indicated that Balistrieri was the owner and Sam Librizzi the manager of this 1979 sports bookmaking operation.

Holmes further testified that the "duplicate" and "self-defeating" wagers reflected in Government's Exhibits 3 and 4 established that the individual identified by the account designation "JP" was at least a writer for this gambling business [7].

designations reflected in Government's Exhibits 6 through 10 appeared in either or both the 1977 wagering conversations (Government's Exhibits 111–121) and the 1980 wagering conversations (Government's Exhibits 122–143) and gambling records (Government's Exhibits 11–30, 40–41).

7. In acquitting John Piscuine on Count 3, the jury could well have concluded that, while the evidence was insufficient to identify him as "JP", there was in fact a person identified as "JP" who was a writer for this gambling business at all times pertinent to Count 3 of the Indictment. Although unidentified, this person could be counted as one of the five persons for purposes of determining jurisdiction under 18 U.S.C. § 1955. See, e.g., *United States v. Bennett*, 563 F.2d 879, 882 (8th Cir.), *cert. denied*, 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282 (1977); *United States v. Clements*, 588 F.2d 1030, 1040 (5th Cir.1979). Furthermore, as the instructions to the jury were framed, jury nullification was possible. Accordingly, the jury could have concluded that Piscuine was "JP" but that he deserved a pass because he was a 76-year-old man. A feeling of sympathy on the part of the jury for Piscuine would be understandable. Besides being 76 years old, this portion of T–101, a taped conversation between Piscuine and Sam Librizzi on October 25, 1979

over a telephone at Leonardo's Pasta House, shows that Piscuine was almost being driven crazy by his inability to reach Librizzi with betting information:

"JOHN PISCUINE: Hello.
SAM LIBRIZZI: Yes sir.
PISCUINE: Yeah, man, you, you ga ... you know you give me ulcers, kid.
LIBRIZZI: Relax.
PISCUINE: I can't take it.
LIBRIZZI: Okay.
PISCUINE: I call up the bar and everything else, you know. I called up the tavern, you know, 15 minutes ago.
LIBRIZZI: Yeah.
PISCUINE: Anyway I got Oakland.
LIBRIZZI: How much?
PISCUINE: 6.
LIBRIZZI: 6, yeah.
PISCUINE: That's for Tish.
LIBRIZZI: Yeah.
PISCUINE: And I got mille scuti on Oakland with, ah, your boy.
LIBRIZZI: Lenny?
PISCUINE: Yeah. Now Oakland just scored.
LIBRIZZI: They did?
PISCUINE: Yeah.
LIBRIZZI: Okay, you got what now?
PISCUINE: I'm glad you called.
LIBRIZZI: Don't worry about it. All right.

Holmes also testified that based upon statements by Sam Librizzi to Balistrieri, Exhibit T–106, the defendant Carl Micelli and an unknown individual were both writers for this gambling business working under the account designation "Matches". Holmes testified that Librizzi's reference to the account designation "Matches" in the first part of this intercepted conversation was meant to include both Carl Micelli and His (Micelli's) unidentified partner, whereas Librizzi's later reference to Micelli by his last name related solely to Micelli. Holmes further testified that Micelli and his unidentified partner's involvement in conducting the 1979 gambling business was suggested by: (1) evidence (Government's Exhibits 111–121) revealing Micelli's role as a writer for the Librizzi bookmaking operation in 1977; (2) evidence (Government's Exhibits 122–143 and 11–30, 40–41) revealing the roles of Micelli and his unidentified partner as writers for Librizzi's 1980 bookmaking operation under the name "Matches"; and (3) reasonable inferences suggested by evidence detailed above that the 1979 bookmaking operation was merely a part of the same continuing gambling business. Specific evidence supported Holmes' opinions in this regard. For example, in an intercepted telephone conversation on February 14, 1980, Micelli and Sam Librizzi discussed reduction of an amount owed by one of Micelli's betting customers to Librizzi. At one point in this conversation, Librizzi told Micelli, "Yeah. But I see him all through the Football season, this was from ..." In response, Micelli stated, "I understand, see, but I was waiting, as long as you got a little piece of money coming, that's the time to pay."[8] In a telephone conversation on February 22, 1980, Micelli advised Sam Librizzi that, "I just got through talking to my partner ..." In an intercepted telephone conversation on March 1, 1980, Micelli told Dennis Librizzi that he gave the "book" to the "other guy" because he (Micelli) was going to "leave in the next thirty-six hours." In an intercepted telephone conversation on March 4, 1980, an unknown individual relayed a series of wagers to Sam Librizzi. These wagers were recorded by Librizzi on Government's Exhibit 29 (a bet slip) under the account designation "Match".

The foregoing evidence detailing the roles of Frank Balistrieri, Sam Librizzi, "JP", Carl Micelli, and Micelli's unidentified partner in the 1979 sports bookmaking business, supports the jury's determination that at least five persons were involved in conducting and managing this illegal gambling business as required by 18 U.S.C. § 1955. Indeed, based on the evidence, the jury could properly have found that more than these five persons were involved in conducting this 1979 bookmaking operation.

For example, in the January 10, 1980 conversation, Sam Librizzi, in responding to Frank Balistrieri concerning the status of delinquent wagering accounts, stated:

> Now Dennis [Librizzi] owes us thirty-seven hundred. *It's on the slip there. What he gave me last week.* (Government's Exhibit T–106, at p. 5) [Emphasis. added].

This statement by Sam Librizzi indicates that his brother Dennis had accepted wagers for their gambling operation during the previous week, the tail end of the 1979–80 football season. Given the date of this conversation, January 10, 1980, any wagers accepted by Dennis Librizzi during the previous week would most likely have been on

---

PISCUINE: Oh, man, you give me ulcers, kid.
LIBRIZZI: Ah, what do you got now, Oakland for ...
PISCUINE: 16 all together.
LIBRIZZI: So it's 2½ for 16.
PISCUINE: Yeah.
LIBRIZZI: Okay.
PISCUINE: Let's win it, huh.
LIBRIZZI: I'll see you tomorrow.
PISCUINE: Oh, man, I can't take it no more, kid. Why you like to call me so late?

LIBRIZZI: Because I just ... I'll tell you tomorrow. Okay?
PISCUINE: All right."

**8.** The sharing of such information as to Librizzi's 1979 football bookmaking operation and Micelli's knowledge in this regard, suggests Micelli's involvement in this operation in a role beyond that of a mere bettor.

**1542**

football games played at the "tail end" of the 1979–80 football season. That Dennis Librizzi was in fact accepting wagers for this gambling business at a much earlier time during the 1979 football season is indicated by an intercepted telephone conversation between John Piscuine and Sam Librizzi on October 25, 1979. In this conversation, Piscuine protested his inability to reach Librizzi to place some wagers. At one point Piscuine stated, "I tried to get ahold of you. Dennis wasn't there." When considered together, these two conversations support the reasonable inference that Dennis Librizzi was at least a writer for the 1979 gambling business throughout the 1979 football season. The evidence also suggests that an individual named Ed Feller[9] was a writer for the 1979 bookmaking operation. In a telephone conversation on February 18, 1980, Feller told Sam Librizzi that due to the volume of bets, "[I]t seemed like football, for crying out loud." In the January 10, 1980 conversation, Librizzi made reference to "Feller's 290" in reporting to Balistrieri on the status of amounts owed by various persons to their gambling business for wagers accepted on games played prior to January 10, 1980. When considered together, the fact of Feller's status as a writer for Librizzi's 1980 bookmaking operation, his statement to Librizzi on February 28, 1980, and Librizzi's reference to Feller in his report to Balistrieri on January 10, 1980, all suggest that Feller was a writer for the 1979 bookmaking business charged in Count 3.

■ Furthermore, the monetary volume of wagering activity reflected by Government's Exhibits 2, 3, and 4 suggests that more than the mentioned individuals were involved in conducting this gambling operation. Holmes computed the amount of gross wagering activity accepted by this business on October 13, 14, and 15, 1979, as reflected in Government's Exhibits 2, 3, and 4. On October 13, 1979, this wagering activity totaled $10,600.00. On October 14, 1979, it totaled $47,655.00, and on October 15, 1979, it totaled $100.00. The total of

$47,655.00 for October 14, 1979, a single day's wagering activity, exceeded any daily total in either the 1977 bookmaking operation when at least seven writers were involved, and in the 1980 bookmaking operation when at least ten writers were involved. Indeed, the total for a consecutive four day period in 1977 was $31,710.00. All of this suggests and supports a reasonable inference that, for purposes of jurisdiction under 18 U.S.C. § 1955, there were at least as many participants conducting the 1979 sports bookmaking operation as there were in the 1977 and 1980 gambling operations. The fact that such individuals were not specifically identified or charged, does not detract from this conclusion. See, e.g., *United States v. Bennett*, 563 F.2d 879, 882 (8th Cir.), *cert. denied*, 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282 (1977); *United States v. Clements*, 588 F.2d 1030, 1040 (5th Cir.1979). Moreover, there is no requirement in the law that the five or more participants be directly and simultaneously involved in the day-to-day workings of the gambling operation. Nor need it be shown that each individual participant generated at least $2,000 in gross revenue in a single day, so long as the gambling business itself met this earnings criteria. See, e.g., *Sanabria v. United States*, 437 U.S. 54, 70 n. 26, 98 S.Ct. 2170, 2182 n. 26, 57 L.Ed.2d 43 (1978); *United States v. Marrifield*, 515 F.2d 877, 880–81 (5th Cir. 1975), *cert. denied*, 423 U.S. 1021, 96 S.Ct. 462, 46 L.Ed.2d 394 (1976).

Accordingly, the evidence amply supported the jury's verdicts of guilt as to Balistrieri, Sam Librizzi, and Micelli with respect to Count 3 of the Indictment.

## COUNT 4—1980 BASKETBALL

■ Defendants Sam and Dennis Librizzi and Carl Micelli challenge the sufficiency of the evidence supporting the jury's verdicts finding them guilty as charged on Count 4 of the Indictment. I believe, however, that the evidence supporting their

---

9. The 1980 intercepted wagering conversations and gambling records established that Ed Feller was a writer for the 1980 bookmaking operation

charged in Count 4. The testimony of Holmes confirmed this fact.

convictions on Count 4 is overwhelming. What is surprising here is not that they were convicted on Count 4 but that Frank Balistrieri was acquitted in the face of strong evidence of his guilt. On January 10, 1980, Frank Balistrieri and Sam Librizzi discussed setting up a sports bookmaking operation that would accept wagers on up-coming basketball games. The profits and losses from such an operation were to be split four ways between Sam and Dennis Librizzi, Frank Balistrieri, and Peter Picciurro [10]. Sam Librizzi was the one who suggested the idea to Balistrieri, and in the course of this conversation referred to the fact that his brother Dennis had already opened up such a bookmaking operation in which Balistrieri and Sam Librizzi were included as partners. Librizzi further advised that he and Dennis were going to "combine" customers and "rent an office".

Telephone conversations intercepted during the period February 12 through March 8, 1980, in which Sam and Dennis Librizzi and others were participants, and gambling records seized from the location utilized by them in accepting wagers and from the person of Sam Librizzi, established that the planned sports bookmaking operation accepting wagers on 1980 basketball games went forward under the supervision and management of Sam and Dennis Librizzi. Indeed, no evidence was presented negating the existence of this or any of the other gambling operations that were apparent in this case. The gambling records which consisted for the most part of bet slips and bottom sheets, in the handwriting of Sam Librizzi, contained entries of wagers and account designations which correlated directly to wagering activity discussed in Government's Exhibits 122 through 143. Based upon all of this evidence, Holmes testified that Sam and Dennis Librizzi were at least writers or partners in this business in that they accepted wagers from customers and writers, disseminated line information and bottom figures, and generally instructed other participants in their conduct of this business. Holmes also testified that

the evidence indicated that Sam and Dennis Librizzi divided the responsibilities of managing this illegal gambling business.

Holmes also identified at least 10 other persons including Micelli, who participated in the gambling business as writers. Again, while one of these writers (John Korich) received a commission, and two others ("Mush-Mush" and "Marco") retained a portion of the wagers they accepted while relaying the balance into the Librizzi office, compensation or a share in the profits is not a necessary prerequisite for finding that an illegal gambling business was being conducted. See, e.g., *Sanabria v. United States, supra; United States v. Greco, supra.*

Finally, Holmes testified to his computations of the gross amount of wagers accepted by this gambling business as reflected in the intercepted wagering conversations and other evidence he reviewed. These computations, which were not disputed, established that this operation accepted well in excess of $2,000 on each of the days that it was in operation. Thus, there is no basis for overturning the jury's verdicts of guilt with respect to defendants Sam and Dennis Librizzi or with respect to Carl Micelli on Count 4 of the Indictment.

### COUNT 1—CONSPIRACY

■ The evidence supporting the jury's verdicts of guilt on Counts 2, 3, and 4 also supports the jury's verdicts finding Balistrieri, Di Salvo, and Sam and Dennis Librizzi guilty of the conspiracy charged in Count 1.

Dennis Librizzi contends that the acquittal of Balistrieri and Picciurro on Count 4 and my dismissal of Count 4 against DiSalvo somehow precludes his conviction for conspiracy as charged in Count 1. This argument overlooks the fact that Sam Librizzi was convicted with him on Counts 1 and 4 of the Indictment, and the fact that Balistrieri and Di Salvo were also found guilty on Count 1. Moreover, even taking

10. Picciurro was also acquitted on this count (as he was on all others), a fact I attribute to the effectiveness of his attorney, William Coffey.

Coffey's superb closing argument quite probably swayed the jury to find in favor of his client.

his argument at face value, it lacks substance in that a judgment of acquittal may not be granted merely because the jury may have reached inconsistent verdicts. See, e.g., *United States v. Jacobs*, 632 F.2d 695, 697 (7th Cir.1980); *United States v. Beck*, 615 F.2d 441, 448 (7th Cir.1980); *United States v. Niemiec*, 611 F.2d 1207, 1210 (7th Cir.1980).

In any event, the evidence established a conspiracy as charged in Count 1 and it established Dennis Librizzi's willful participation in that conspiracy. On December 29, 1977, Dennis Librizzi was observed meeting with Nunzio Basile, a writer for Sam Librizzi's 1977 bookmaking operation, at the Kohl's Food Store parking lot on Mequon Road. This meeting occurred pursuant to arrangements made the previous day in an intercepted telephone conversation between Sam Librizzi and Basile. The jury could reasonably have inferred from this conversation and from other wagering conversations between Sam Librizzi and Basile, that this meeting had been arranged so that Librizzi could pay Basile amounts owed for previous wagers he had called in. As previously related in my discussion of Count 3, John Piscuine, in conversations with Sam Librizzi on October 25, 1979, protested his inability to reach Librizzi and detailed efforts he had taken in this regard in order to place wagers. At one point in the conversation, Piscuine stated, "I tried to get ahold of you. Dennis wasn't there." Dennis Librizzi's involvement in the conspiracy charged is further substantiated by Sam Librizzi's conversation with Frank Balistrieri on January 10, 1980. In this conversation, Sam Librizzi advised Balistrieri of a $3,700 debt owed to "us" by his brother Dennis for wagers he had turned in to Sam "last week". Librizzi also stated that his brother Dennis had already opened up a bookmaking operation accepting wagers on basketball games, and that he and Balistrieri were to be included as partners. He also stated that he and Dennis were going to "combine" customers and "rent an office". After further discussion, an agreement was reached that Balistrieri, Sam Librizzi, Picciurro and Dennis Librizzi would enter into a four-way partnership which would accept wagers on 1980 basketball games. While both Balistrieri and Picciurro were acquitted on Count 4, the jury could reasonably have concluded based on this intercepted conversation, that Balistrieri was one of the participants in the 1980 sports bookmaking operation as of January 10, 1980. Indeed, Balistrieri's own expert, Mr. Foy, agreed that this was probably the case. Although the jury may have had a reasonable doubt as to whether Balistrieri went forward with the scheme thereafter, it could also have reasonably concluded that defendant Balistrieri continued as a co-conspirator with Sam and Dennis Librizzi at least until January 10, 1980.

Both the law and the evidence clearly support the jury's verdicts finding Balistrieri, Di Salvo and Sam and Dennis Librizzi guilty as charged in Count 1. The motions for judgments of acquittal are denied.

## WAGERING TAX COUNTS, 5 to 11

■ It is undisputed that Balistrieri and Sam and Dennis Librizzi failed to file Internal Revenue Service tax forms 11–C and 730. The evidence already recited established that Balistrieri, and Sam and Dennis Librizzi engaged in the business of accepting wagers on sports events. Accordingly, they were obligated to file IRS tax form 11–C as charged in Counts 5 (Balistrieri and Sam Librizzi) and 6 (Dennis Librizzi). They were also obligated to file monthly excise tax returns (IRS Form 730) listing all wagers accepted by their business, at the times charged in Counts 7 (Balistrieri and Sam Librizzi), 9 (Sam Librizzi), 10 (Sam and Dennis Librizzi), and 11 (Sam and Dennis Librizzi). See, e.g., 26 U.S.C. §§ 4401, 4411 and 4412; *United States v. Pasha*, 332 F.2d 193, 194–5 (7th Cir.1964), *cert. denied*, 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1965); *United States v. Markis*, 352 F.2d 860 (2d Cir.1965); *c.f.: United States v. Ferro*, 126 F.Supp. 958 (D.Conn. 1954); *Marderosian v. United States*, 337 F.2d 759, 760 (1st Cir.1964). Moreover, as I instructed the jury, there is no requirement under 26 U.S.C. §§ 4401, 4411, and 4412 that five or more persons be involved in the business of accepting wagers before

the filing requirements apply. Unlike 18 U.S.C. § 1955, even a single person shown to be engaged in the business of accepting wagers on sports events is obligated to file IRS Forms 11–C and 730 at the appropriate times.

■ The evidence presented in this case demonstrating the nature, duration, and extent of the defendants' involvement in the business of accepting wagers on sports events justified the jury's conclusion that Balistrieri and Sam and Dennis Librizzi knowingly and wilfully failed to file IRS tax forms 11–C and 730 as charged in the above-noted counts of the Indictment. Accordingly, the jury's verdicts with respect to these wagering tax counts is supported by the evidence, and the motions for judgments of acquittal with respect to them are denied.

## MOTIONS FOR A NEW TRIAL

Approximately 95 "errors" are designated by the defendants in support of their motions for a new trial. While I am slightly aghast at the number (counsel for Frank Balistrieri and counsel for Sam Librizzi alone, in almost identical motions, have each pointed to 86 errors), I am comforted in noting that some of the errors were allegedly committed by Judge Robert W. Warren, Judge John W. Reynolds and Magistrate Aaron Goodstein. They are not all chargeable to me.

■ Motions for new trials in criminal cases are addressed to the sound discretion of the trial court. It is well settled that such motions are not favored and should be granted only with great caution and only in exceptional circumstances. See, e.g., *United States ex rel. Darcy v. Handy*, 351 U.S. 454, 76 S.Ct. 965, 100 L.Ed. 1331 (1956); *United States v. Johnson*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946); *United States v. Redfield*, 197 F.Supp. 559, 562 (D.Nev.1961), *affirmed*, 295 F.2d 249 (9th Cir.), *cert. denied*, 369 U.S. 803, 82 S.Ct. 642, 7 L.Ed.2d 550 (1962). Such motions should only be granted where the court finds that there has been a miscarriage of justice or that "the evidence preponderates heavily against the verdict". *United States v. Indelicato*, 611 F.2d 376,

387 (1st Cir.1979); *United States v. Redfield*, 197 F.Supp. at 562. Evidentiary rulings by the trial court do not warrant a new trial unless the defendant can clearly demonstrate that the court abused its wide discretion. *United States . v. West*, 670 F.2d 675, 682–8 (7th Cir.), *cert. denied*, 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982). In order to prevail on a motion for a new trial, a defendant must demonstrate that substantial prejudicial error occurred during the trial. The burden upon a defendant to establish the existence of prejudicial error is a heavy one. It is not satisfied by unsupported, conclusory allegations or speculation. See, e.g., *United States ex rel. Darcy v. Handy*, 351 U.S. 454, 76 S.Ct. 965, 100 L.Ed. 1331 (1956); *United States v. Redfield*, 197 F.Supp. at 562; *United States v. Gross*, 375 F.Supp. 971, 974–5 (D.N.J.1974), *affirmed*, 511 F.2d 910 (3d Cir.), *cert. denied*, 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975). As was aptly stated by the court in *United States v. Gross, supra:*

> The jury's verdict, however, is entitled to presumptive validity and the trial court should exercise its authority in this area very sparingly and only in the most exceptional cases when it is convinced that a gross injustice will have been done if it fails to act. 375 F.Supp. at 973–4. (Citations omitted.)

Application of these standards to the present motions for a new trial reveals that they are without merit.

The defendants (only those who were convicted—the two who were acquitted would probably not make the same argument) contend that the nature and extent of the publicity before and during trial was such that it deprived them of their right to a fair trial. Although all convicted defendants complain about many items of publicity, the major claim centers on a front page article with the headline: "Judge Says Evidence Is Against Balistrieri" that appeared in the September 27, 1983 edition of The Milwaukee Sentinel. This headline formed the basis for a mistrial motion made by Dennis Librizzi and joined in by the other defendants. I took the motion under ad-

visement and then gave verbatim to the jury an instruction tendered to me by counsel for Sam Librizzi. This instruction informed the jury in general terms as to the nature of the prior day's proceedings (a ruling on defense motions to dismiss at the close of the government's case and one concerning the admissibility of certain evidence) and further reiterated that I had no opinion concerning the guilt or innocence of the defendants. I also stated that no action taken or statement made by me should be interpreted by the jury as indicating anything to the contrary.

■ There is no evidence that any juror was exposed to the Sentinel headline or, for that matter, to any other publicity concerning the case during the trial. In passing on this issue, I note that I believe all necessary precautions were taken throughout the trial to prevent exposure by the jury to any form of publicity. These precautions included repeated instructions to the jury to avoid all forms of publicity concerning the case and, at several points in the trial, I voir dired the jury in this regard. The motions seeking a new trial on prejudicial publicity grounds are denied.

Although I have denied the motions, I believe a comment on the nature of the publicity attending this trial is appropriate. Only two matters, The Milwaukee Sentinel headline of September 27, 1983, and the playing, on WISN–TV Channel 12, of a tape not yet played in the courtroom (and the accompanying comments by reporter Scott Feldmeyer), were of concern to me. The newspaper reporting, particularly that of veteran legal affairs reporter Walter Fee of The Milwaukee Journal was fair and accurate. Except for the September 27th edition, the reporting by Michele Derus of The Milwaukee Sentinel, was also fair to the parties. None of the reports—including the major television news reporting, by Jeff Jackson of WITI–TV Channel 6, Catherine Heenan of WTMJ–TV Channel 4, and, except for the commentary accompanying the "Matches tape" by Mr. Feldmeyer— "sensationalized" the trial. Certainly no "circus atmosphere," as claimed in one of the defendants' more exaggerated attacks on the conduct of this trial, was created.

The playing of the tape on Channel 12 was a matter of concern at the time because I did not know how it came into the possession of Mr. Feldmeyer. Mark Vogel, one of two prosecutors, acknowledged that he had given the tape to Feldmeyer, believing that it was proper to do so. I find that Mr. Vogel acted in good faith and, at best, a misunderstanding occurred as to any distinction to be drawn between tapes admitted and played in the courtroom and those that were merely admitted. While Mr. Feldmeyer may have gone a bit overboard in making his comments as the tape was played on the air, I do not believe that the matter warrants further attention or action on my part. Mr. Vogel and Mr. Feldmeyer, if they were directly or indirectly accused of any improprieties in the handling of the questioned tape, are exonerated.

The Milwaukee Sentinel's "Judge Says Evidence Is Against Balistrieri" headline is the only real blemish on the media coverage of this case. The headline was not only inaccurate, it was also, in my judgment, irresponsible. Fortunately, under the totality of circumstances, it did not require the scuttling of the trial at the time nor does it require the ordering of a new trial now.

Di Salvo and Dennis Librizzi also seek a new trial based on their assertions that the verdicts of the jury were against the weight of the evidence. The evaluation of the evidence on the judgment of acquittal motions demonstrates that this request must be denied.

Balistrieri and Di Salvo also contend that they are entitled to a new trial based upon what they perceive were improper comments by prosecutor John Franke in the rebuttal portion of his closing argument. In evaluating these allegations, it should be noted that no objection was made at any time to any statement made by Mr. Franke in his closing argument. Therefore, the present allegations must be judged under the plain error standard of Rule 52(b) of the Federal Rules of Criminal Procedure. While the defendants have not identified the precise portions of Mr. Franke's rebut-

tal argument deemed to be improper, I believe his argument was, in addition to having been very good, a fair and proper response to the arguments made by the defendants' attorneys. This, coupled with the fact that I instructed the jury on several occasions that the comments and arguments of counsel were not to be considered as evidence, compels a finding of no error on this point.

The defendants also assign error to my decisions declining to give a number of the instructions they submitted. An enormous package of proposed jury instructions was submitted. All were reviewed and considered by me. After my review I gave what I found to be a correct and appropriate charge to the jury. Accordingly, I find that nothing in the instructions given, nor in my rejection of certain ones that were proposed, warrants the granting of a motion for a new trial.

The remainder of the defendants' many allegations of error essentially ask that I reconsider and reverse previous pretrial and trial rulings as well as the various pretrial rulings made by Judges Warren and Reynolds, and Magistrate Goodstein. The defendants present nothing new in these allegations and the issues underlying them have, for the most part, been extensively briefed and argued. Moreover, I believe these issues were properly decided and that there is no merit to any of the defense arguments on the matters already resolved.

With the exception of one matter, the claim regarding communications with the jury, I have covered all new trial matters raised by the defendants that even remotely deserve comment. The "communication" issue will be discussed in the next section of this decision. Accordingly, all new trial motions are denied.

MOTIONS RELATING TO JURY "COMMUNICATIONS" AND MOTION FOR EVIDENTIARY HEARING REGARDING JURY VERDICT ON COUNT TWO

The next issue I address concerns defense motions that go to the manner in which this case was decided by the jury. To the extent that these motions question the integrity of the procedures used, and I believe that they do, they are denied. These motions are an attempt to hit below the belt. They demonstrate the extremes to which certain defense counsel will go to try and undermine the trial of this case.

I put the motions in the exact words of the attorneys who filed them:

(1) Stephen Glynn, counsel for Sam Librizzi, on his 54th purported "error" requiring a new trial states:

"The court erred in communicating with the jury on numerous occasions during their deliberations without notification or consultation with defendant or his attorneys."

(2) John Tucker, counsel for Frank Balistrieri, on his 54th alleged "error" purporting to demonstrate the need for a new trial states:

"The court erred in communicating with the jury on numerous occasions during their deliberations without notification or consultation with defendant or his attorneys, including specifically the court's communication with and supplying to the jury an additional verdict form relating to this defendant's guilt or innocence on Count 2 of the indictment after the jury had already reached and signed a unanimous verdict on Count 2 as to this defendant."

In his separate but related motion on Count 2, Mr. Tucker seeks an evidentiary hearing regarding the jury verdict on that count, and an order authorizing him to issue subpoenas to the members of the jury to attend the hearing.

Scrupulous care and patient effort went into the selection of the jury in this case. Every potential juror was questioned individually, and those that were accepted as qualified executed statements that said:

"I, _____, understand that I have been accepted as a qualified juror to serve in a case pending in the United States District Court for the Eastern District of Wisconsin. I acknowledge that I

have been told by Judge Evans to not discuss this case at any time with anyone until instructed further by the judge. I further acknowledge that I have been instructed by Judge Evans not to read any newspaper accounts of the case or to watch any television news broadcasts or listen to any radio news broadcasts regarding the case or regarding any of the people involved in the case. By signing this statement I promise to follow the judge's instructions and to return to the Federal Building, Courtroom # 390, on Tuesday, September 6, 1983, at 9:30 a.m., for further proceedings in this case.

Qualified Juror

Dated: _____, 1983."

It took four days to qualify a panel of 41 jurors from which an ultimate jury of 16, including alternates, was selected. The jurors selected were very impressive. Throughout the trial they appeared to pay close attention to the evidence as it was presented. Their deliberations were spread over 5 days, and from what I can determine from the few written questions (all inquiries to me from the jury were in writing) I received, the jury was extremely diligent and thorough during its discussions. On Sunday, October 9, 1983, the jury returned 38 verdicts, 24 for guilty and 14 for not guilty. The entire handling of the jury during its deliberations by me, my staff, and the U.S. Marshals sworn for that purpose was of the highest order. The motions of Mr. Glynn and Mr. Tucker almost suggest that I went into the jury room during deliberations and "communicated with [the jurors] on numerous occasions ... without notification or consultation with the defendant or his attorneys".

First of all, there were no improper communications with the jury during deliberations (for that matter during the entire trial) in this case. During deliberations, the jury asked a number of questions and made a number of requests. All were in writing. Action was taken by me depending upon the nature of the question asked or request made. If the question was a routine one ("Are we allowed to take any documents back to the hotel, specifically

juror's instructions"), it was usually immediately answered, in writing, by me. The notes and my written response were saved and all counsel informed of what occurred and a complete record of all such communications was made at an appropriate time after the attorneys were summoned to court. This procedure was agreed to by all counsel. They did not want to remain in the courtroom (or in Milwaukee for that matter) during the jury's deliberations, nor did they ask to be consulted before any action was taken regarding jury requests. In short, the matter was committed to my discretion.

As to some matters, like a request that I answer a question regarding the elements of conspiracy, the jury was told that it would take some time to get an answer for it because the attorneys had to be consulted regarding the inquiry. When this occurred, all counsel were called to court and a complete record was made. I then made a decision and informed the jury, either in writing or in open court, of the answer to the question. We have nothing in this business unless we—judges and lawyers—have integrity and a commitment to honesty and fair play. Nothing in the handling of the jury during its deliberations was improper or questionable in any way. The general challenge to the handling of the jury during its deliberations is denied.

Turning now to the specific objection regarding Count 2 and the request that a hearing be held and subpoenas issued for the jurors, the following facts should be noted. On Saturday, October 8, 1983, at 10:40 a.m., the following note was received from the foreperson of the jury:

"October 8, 1983
10:40 a.m.

Judge Evans,

There has been doubt cast on two decisions the jury has already voted on. Unfortunately, I have already filled out the verdict forms on those two decisions and as such request for two new forms. The forms are Count 2 for Steve Di Salvo and Count 2 for Frank Peter Balistrieri. Sor-

ry for the inconvenience, it won't happen again.

Roger S. Franzel"

I answered the note in writing stating: "Dear Jury—

Here are the two verdict forms that you requested.

Judge Evans

10:40 10/8/83"

The verdict forms, as requested, were supplied. The attorneys were advised over the telephone of the jury request and the court's response. No one asked that anyone be called into court and a record made on the point. The next day, Sunday, October 9, 1983, at 3:45 p.m., I was advised that the jury had finished its deliberations. At 6:00 p.m., the verdicts were received.

The motion on this point is so patently without merit that I am almost reluctant to discuss it for fear that by doing so I will lend it some semblance of dignity that it certainly does not deserve. Fear aside, one comment, and one comment only, is sufficient to put this allegation of error to rest. Contrary to the defendants' assertions, the "verdict" returned by the jury to me in open court in accordance with Rule 31(a) of the Federal Rules of Criminal Procedure, is the only "verdict" adjudicating the charges against Frank Balistrieri and Steve Di Salvo on Count 2 of the indictment. There is and there was no other "verdict" in this case on Count 2. Any decisions, votes, or agreements by jurors in the jury room—be they for guilty or for not guilty—have no force, relevancy or effect.

The basis for this meritless motion lies in two identical affidavits—one by Attorney Tucker, and one by Attorney Glynn. The affidavits recount Tucker and Glynn's interviews with at least two of the jurors who tried this case.

The post-verdict juror contact by Messrs. Tucker and Glynn was undertaken without prior court approval. The actions of Attorneys Glynn and Tucker in this regard are not, in my judgment, consistent with the standards that should be expected of counsel, even losing counsel, in cases such as this. The law does not favor post-verdict contact with jurors and when asked, courts

usually decline to authorize it. *See, e.g., Wilkerson v. AMCO Corp.,* 703 F.2d 184 (5th Cir.1983); *King v. United States,* 576 F.2d 432, 438 (2d Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); *United States v. Franks,* 511 F.2d 25, 37–38 (6th Cir.1975). Had counsel here asked for permission to interview the jurors, on the basis of this record, the request would have been denied.

■ I do not know, nor do I care, what the jurors decided or did on Count 2 before they returned their verdict to me in open court. I do not care because it is irrelevant. My ministerial act of providing the jury, at the written request of its foreperson, with two blank neutral verdict forms identical in every respect to forms previously provided to the jury, was not error. The motion is denied, as is the request to authorize the issuance of subpoenas for the members of the jury.

## JANUARY 5, 1984 MOTION OF DENNIS LIBRIZZI FOR A NEW TRIAL

On January 5, 1984, Dennis Librizzi filed a motion seeking permission to file, as timely, an additional motion for a new trial. The motion alleges that the factual information supporting the January 5, 1984 motion for a new trial did not come to the attention of his counsel, Mr. Sutton, until December 31, 1983. The timeliness motion is supported by Mr. Sutton's affidavit. It is granted. The additional new trial motion may be filed and all other defendants are deemed to have joined in it.

The additional new trial motion, signed by Mr. Sutton, says that one of the jurors—Douglas Plinska—"was deliberately untruthful in concealing upon voir dire examination a social relationship with James McDermott, a Special Agent of the Federal Bureau of Investigation ...". Plinska, the motion states "... thereby secreted non-objectivity and bias against the defendant and thereby deprived the defendant of a fair trial ...".

In support of the motion, Mr. Sutton has filed affidavits from Gregory Gramling,

Jr., and Russell J. Rose. The affidavits, in essence, allege:

(1) That James McDermott is a Special Agent of the FBI assigned to its Milwaukee office.

(2) That McDermott and juror Plinska were teammates on a softball team (Pepino's) in an over thirty-five league operated by the City of Brookfield. The team roster included 19 players.

(3) That the team played weekly games from May to August of 1983.

Gramling's affidavit also states that he met with juror Plinska on or about December 22, 1983 and asked him questions about the matter and Plinska refused to make any comment.

In the preceding portion of this decision I noted my disdain for the actions of Attorneys Glynn and Tucker, who contacted at least one juror each after the verdicts were returned without seeking prior court approval for such contact. I have the same disdain for the actions of Mr. Gramling, who is also an attorney. Although Gramling was not involved directly as counsel for any of the defendants, I take judicial notice of the fact that he is identified in this case with both the defendants and their attorneys because he was in court for most of the trial, and I often observed him coming and going and otherwise conversing with members of the defense "team". Also, at one point in the proceedings I was informed that Attorney Richard Surges, counsel for Carl Micelli, may have a conflict for a few hours and that if he did, Attorney Gramling would sit in for him. Accordingly, I believe it fair to view Gramling as almost an agent for the defense counsel directly involved in this case.

■ The kind of post-verdict juror contacts apparently orchestrated by a few of the defendants and their attorneys or agents in this case are simply not proper. I would feel the same way had the contacts been undertaken by the government. Imagine the chilling effect on potential jurors if they know that other jurors who have acquitted defendants received nocturnal visits by FBI agents asking about their background or why they voted not guilty in

a case. Such visits by disgruntled defendants, attorneys or agents of either carry the same chilling potential for future jurors. All such visits amount to an invasion of the privacy rights of jurors who have already served. An interesting point to note on this issue is that the defendants, in their requested jury instructions, piously asked in number 5 that I tell the jury:

"The verdict of a jury may not be impeached. Your verdict is the verdict of the jury. No one in the world has the right to question you as to how you arrived at your verdict."

I wish they had followed their requested admonition.

What we are talking about is the integrity of the jury system. The general principle applicable here was so admirably stated by Judge E. Barrett Prettyman in *Rakes v. United States,* 169 F.2d 739, 745–46 (4th Cir.1948), that I join other judges who have quoted him in full. Judge Prettyman said:

"The inviolability of the jury room from outside influence of any sort, actual or potential, is a prime necessity in the administration of justice. That unqualified rule requires that if a person, whether on the jury or not, knows of such outside influence, or an attempt at it, he must at once report his information to the court. The same rule requires that jurors are not to be harassed in any manner because of a verdict they have rendered. If jurors are conscious that they will be subjected to interrogation or searching hostile inquiry as to what occurred in the jury room and why, they are almost inescapably influenced to some extent by that anticipated annoyance. The courts will not permit that potential influence to invade the jury room. He who makes studied inquiries of jurors as to what occurred there acts at his peril, lest he be held as acting in obstruction of the administration of justice. Much of such conversation and inquiry may be idle curiosity, and harmless, but a *searching* or *pointed* examination of jurors in behalf of a party to a trial is to be emphatically condemned. It

is incumbent upon the courts to protect jurors from it."

The post-verdict juror contact in this case caused several jurors to call me and complain. Several said they had felt "harassed" by a man who said he was a private investigator working for Frank Balistrieri. One juror reported that his "no comment" was met with a "what do you have to hide". A woman juror told me that the man asked if she had been drinking alcohol during deliberations. This conduct, on the part of anyone connected with the defense in this case, is reprehensible. Because of this activity, I conducted a hearing in court on January 16, 1984, and ordered that all such contact cease. Any violations of that order will be treated as a matter for the contempt power of the court.

■ Turning to the specific motion regarding juror Plinska, I will accept as true the following:

1. James McDermott was, and still is, a Special Agent employed by the FBI.

2. McDermott and juror Plinska were two of the nineteen players on the Pepino's softball team, a team that participated in an "over thirty-five" softball league operated by the City of Brookfield.

3. The softball team played weekly games from May to August of 1983.

4. The team held a banquet on October 15, 1983 at Pepino's Restaurant, and that a picture was taken of the players who were present. The picture shows 17 men, including McDermott and Plinska.

5. When the prospective jurors in this case, about 70 in number, were questioned as a group by me on August 29, 1983, they were asked: "Do any of you personally know or are you related to, by blood or by marriage, any present or past employees of the FBI? Juror Plinska did not answer "yes" to the question.

Accepting these facts as true, I believe the motion of the defendants could have been denied without any further to do. Nothing in the scenario of facts suggests that Mr. Plinksa personally knew any FBI agent, for to know someone implies knowledge consciously possessed. To further explain and make the record clear, however, I called Mr. Plinska on Saturday, January 14, and asked him if he would come to court on Monday, January 16, and make a statement about the matter. He graciously agreed.

At the hearing, while under oath, Mr. Plinska said he played on about 40 to 50 softball teams over the last 15 to 20 years, and that he turned 35 last year and joined, for the first time, a team in the "35 and over" league sponsored by the City of Brookfield. The team included about 15 "hard core" members who showed up for most games, and 3 or 4 others who only showed up for a few games. The team played about 14 games during the season, all on Monday nights.

Plinska explained that he did not know McDermott except for the fact that McDermott was also on the team. They did not socialize together, and he did not know McDermott's occupation until the team banquet was held on October 15, 1983, 6 days after Plinska's duties as a juror in this case had come to a close.

I accept as true, without reservation, the sworn statements of Mr. Plinska given in court. He was not "deliberately untruthful" on voir dire as the defense motion states. In fact, but for the privileged forum where this accusation against him was made, it would be libelous.

I find Mr. Plinska to be honest, forthright and a credit to the fine cadre of jurors who served in this case. On behalf of the courts I apologize for the invasion of his privacy that has occurred (Mr. Gramling, who ironically represented Mr. Balistrieri at the January 16 hearing, even went unannounced to Plinska's place of employment to talk with him), and for the inconvenience to him in making a trip to court to testify on January 16. The motions of the defendants for a new trial on this point are denied.

## SENTENCING

Sentencing was originally scheduled in this case for December 12, 1983. Because it appeared possible that I would be trying another case (*United States of America v. Balistrieri and Cannizzaro*, Case No. 81–

CR–155) on December 12, and had another (*United States of America v. Balistrieri and Balistrieri,* Case No. 81–CR–154) scheduled to go to trial on January 9, 1984, and one more (*United States of America v. Balistrieri, et al.,* Case No. 81–CR–153) ready to go on February 28, 1984, I sent a letter to all counsel on November 17, 1983, asking for comments on whether sentencing should be adjourned until all of the cases were tried. A number of reasons prompted my concern, not the least of which was a desire to avoid the type of publicity generated by a sentencing proceeding. The publicity would have been just one more thing to contend with when selecting jurors for other cases.

All of the defendants have written in response to my letter of November 17, and all have stated that they had no objection to an adjournment until after all of the cases in this series were completed. The government objects to a delay.

I believe an adjournment of sentencing to be appropriate under the circumstances. Accordingly, unless modified sooner by court order, sentencing in this case will be adjourned until after proceedings in Case 81–CR–153 are concluded.

## SUPPLEMENTAL OPINION

Yesterday I filed a 47-page decision that resolved numerous post-trial motions that were pending in this case. Included in that decision was an order denying the January 5, 1984, new trial motion based on the fact that juror Douglas Plinska was on a softball team from May to August of 1983 with FBI Agent James McDermott. After my decision was prepared, another defense affidavit—this one from Joseph Armeli, owner of Pepino's Restaurant—was filed. My decision did not discuss the new affidavit. This decision will.

Pepino's Restaurant, 17065 West Capitol Drive, Brookfield, was the sponsor of the softball team that included Plinska and McDermott as two of its 19 members. Mr. Armeli, the owner of Pepino's, states in his affidavit that an organizational meeting for the team was held at his restaurant in late April or early May of 1983. According to Mr. Armeli, 8 or 9 people were present, including Plinska and McDermott. Armeli states that he remembers being introduced to McDermott at the meeting, and that when introduced he was told that McDermott was an FBI agent. Armeli states that he believes his introduction to McDermott was within the sight and hearing of Plinska.

I have no reason to doubt any of the statements in the Armeli affidavit. I will accept them as true. They do not, however, raise any question in my mind that the motion of January 5, 1984 should remain denied.

McDermott was not involved in this case. The softball season was over when Mr. Plinska arrived in court to begin the jury selection process on August 29, 1983. At best, assuming perfect attendance, Plinska and McDermott played about 14 Monday night softball games on the Pepino team from May to August of 1983. Their contact with each other did not go beyond the limited context of being teammates of the softball team. Plinska did not know McDermott before the team was formed, and did not socialize with him. I believe Plinska when he says he did not know that McDermott was an agent. Even if he may have heard what McDermott did, it did not register as important to him. I reiterate my finding that Plinska did not deliberately lie during voir dire.

The filing of this new affidavit gives me an opportunity to write again in this case and make a statement, by way of an addendum, to my decision of January 19, 1984. In that decision I was critical of Attorneys Tucker and Glynn for contacting jurors after the trial without prior court approval. I also felt that their "54th assignment of error"—the claims regarding juror communications—were allegations that unfairly questioned the integrity of the court. Accordingly, I deemed it proper and, in fact, necessary, to pointedly observe that I thought their actions and claims were wrong and without merit. I still feel the same way.

I believe my remarks regarding Glynn and Tucker were appropriate. I do not

regret making them. However, I do very much regret that I did not put my comments about Tucker and Glynn in the proper context of how they otherwise performed their professional duties in this case. This motion gives me opportunity to make the record clear.

Stephen Glynn is an outstanding attorney. His representation of Sam Librizzi was of the highest order. He discharged his obligations during this trial with thoroughness and professionalism.

John Tucker is an attorney whose reputation precedes him. I was thoroughly impressed with the way he conducted the defense of Frank Balistrieri. His skillful dissection of Exhibit 106—the critical tape involving his client—was extraordinary. He performed his difficult assignment in this case with great skill.

Glynn and Tucker are trial attorneys that are more than a cut or two above the caliber of counsel I have seen in action over the last 10 years. In this case they both performed well. Although I disagreed vigorously with their positions on two items, my observations should be placed in the proper context of their overall performance which was, in my judgment, exemplary.