**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Dominic GRECO, Sr., Defendant-Appellant.**

**No. 79–1509.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1980.

Decided April 7, 1980.

terrae." See William S. McKechnie, *Magna Carta* (2nd ed. 1914) 381–82.

Gerald M. Werksman, Chicago, Ill., for defendant-appellant.

Warren E. White, Asst. U. S. Atty., Danville, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, CUMMINGS, Circuit Judge, and PECK, Senior Circuit Judge.*

JOHN W. PECK, Senior Circuit Judge.

The appeal in this case was perfected from a judgment of conviction entered on a jury verdict finding the defendant-appellant guilty of each count of a 2-count indictment charging him to have violated 18 U.S.C. § 1955, which makes it a crime for five or more persons to be involved in a gambling business, and of a violation of 18 U.S.C. § 371, charging that he conspired to violate Section 1955. A 1-year committed sentence was imposed under Count 1, and a $10,000 fine and 5-years probation were imposed under Count 2.

Few of the operative facts are in controversy on appeal, and indeed were not at trial. Greco freely admitted that he and one Charles Finn were partners in an illegal sports bookmaking business which was in substantially continuous operation for over 30 days and had a gross receipt of $2,000 in any single day, and that that business was operated in the Eastern District of Illinois, and elsewhere. Thus, Greco made it clear

* Honorable John W. Peck, Senior Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

to the jury from the outset that he conceded every element necessary for the government to prove its case under Count 1 with the single exception of the element which requires that five or more persons be involved in the conduct of the gambling operation. Indeed, an admission as to all of the other elements was contained in Greco's opening statement to the jury.

With this clear blueprint before it, the government patterned a case designed to establish the participation of at least three other persons with Greco and Finn in their gambling business. The first ten witnesses called by the prosecution were Special Agents of the Federal Bureau of Investigation, and it is not unfair to characterize their testimony as following a general pattern. Most of these witnesses testified that they had been in a coordinated surveillance of Greco in Southern and Central Illinois between September, 1976, and October 8, 1977, which was the period alleged in the indictment. It was established that Greco had been seen a number of times in the Champaign-Urbana area, and that he had been seen more than once at Heinhold Commodities and at The Pub in Lincoln Square Shopping Center, both in Urbana, Illinois. On said October 8, two agents executed a search of the defendant and his residence in Springfield, Illinois, in the course of which gambling paraphernalia and a cashier's check for $250.00 were seized.

A series of seven of the Special Agents testified that they had participated in gambling raids and in the execution of search warrants at various residences and places of business, including the Cabaret Lounge in Champaign, Heinhold Commodities in Urbana, and the Hard Hat Inn in Decatur, all in Illinois. Gambling information and paraphernalia were seized in each instance, as were lists of telephone numbers to be used in placing bets. On the bottom of one list was a note written by Greco saying that he would be away for several weeks and that bets should be placed with Mister "C", and on another, "What Happened Let Me Hear From You I need action s/dom." Testimony established that Charles Finn was often referred to as "Charlie" or Mister "C", and

that the appellant, Dominic Greco, was referred to as "Dom."

Another of the FBI agents testified as the government expert on gambling. He explained that gambling on sports events involved the addition of points to the underdog's score or the deduction of points from the favorite's score, an adjustment made to theoretically equalize the chances of the contestants, and that this information was commonly referred to as the "line." He testified that betters normally contact bookmakers, usually by telephone, to determine the line on games, or series of games, in which they are interested. Most of the bets were placed by phone.

The witness further explained that a bookmaker's profit is normally derived from an additional fee or commission, usually 10%, added to the sum wagered, and to be paid by the loser; winners are paid the amount of the wager without an addition or deduction. This amount of profit to the bookmaker is commonly referred to as "vigorish", "vig" or "juice." He explained that having good line information, and the consequent establishment of a sound line, was essential to the bookmaking business, and stressed the importance of a bookmaker's maintaining a good working relationship with other bookmakers. In addition to helping him establish a sound line, this relationship, he testified, was important in making it possible for a bookmaker to himself place bets with other bookmakers when his own book became dangerously out of balance in a given event. This rebetting he referred to as "lay-off" betting, which he defined in this manner: "[A] lay off . . . is a bet from one bookmaker to another bookmaker to get in a position that he feels comfortable with or [to] get himself into a position he wants to be in." This definition, as will hereinafter appear, appellant contends is so vague as to be worthless, and indeed it appears to be wanting.

This agent further testified that a lay off is an effort to achieve what the bookmaker feels is a desirable ratio of betting on both sides of a wager. If his books balance, that

is, if he has the same amount bet on both sides, the bookmaker assures himself a profit—the "vigorish." The agent went on to explain that when a better makes a bet with his bookmaker, he need only give his betting account number, and then make the bet without giving his name, thus guaranteeing a degree of anonymity.

A dozen witnesses testifying for the government said that they placed wagers on sporting events, usually with Greco, either directly or through Mr. "C", although in some instances, the fact that the bet was made with Greco was only inferred. These individuals included a farmer, a commodities broker, a contractor, a shoemaker, and several persons who "accepted bets on sporting events." All of these individuals, including those in the latter group, testified that the bets placed with Greco were made for the purpose of winning on their own personal accounts, and each denied that any of the wagers were lay off bets.

Whether these wagers were lay off bets is a question which is at the very heart of this litigation, although the parties differently frame the issue. In their briefs, they agree that the first two issues are whether there is sufficient evidence in the record to sustain the appellant's conviction under the two counts respectively; whether the court properly instructed the jury as to the essential elements of the offense charged in Count 2 and whether the trial court erred in refusing to define certain terms, including lay off wagering, in the jury instructions are further issues raised by the appellant. Implicit in the contentions of the parties is a recognition of the fact that if, in accepting bets from at least three of the persons who testified, Greco was in fact accepting lay off wagers, he was involved with at least five persons in a gambling business (since his involvement with Charles Finn is conceded). The fact that all of the witnesses who placed the wagers in controversy denied that they were lay off bets does not, of course, terminate the consideration, and a study of the facts and applicable law is essential to the resolution of that question.

I

We observe first that any trier of fact possessed of no knowledge of the mechanics of the bookmaking business, including lay off wagering, could not find Greco guilty under Count 1 on the facts in this record. The question therefore becomes whether a properly instructed jury would be able on this record to infer that by reason of accepting lay off wagers or otherwise Greco was involved in the gambling business with the requisite number of persons.

18 U.S.C. § 1955, which forms the basis of the charge of the first count, provides in pertinent part:

Whoever, conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

The statute then goes on to provide that, as used in "this section," an "illegal gambling business" means a gambling system which (among other things) "involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business." The words "finance, manage, supervise, direct or own" are all words which are used in their ordinary sense. *See United States v. Bobo*, 477 F.2d 974, 988 (4th Cir. 1973), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774 (1975). The word "conduct" is broad in scope, *United States v. McHale*, 495 F.2d 15, 18 (7th Cir. 1974); *United States v. Hunter*, 478 F.2d 1019, 1022 (7th Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973), and "means to perform any act, function or duty which is necessary to or helpful in the ordinary operation of the business, and . . . a person may be found to conduct a gambling business even though he is a mere servant or employee having no part in the management or control of the business and no share in the profits, *but . . . a mere bettor or customer of a gambling business* cannot be said to conduct the business." *United States v. Rotchford*, 575 F.2d 166, 174 (8th Cir. 1978). (Emphasis supplied.) The Court stated in *Sanabria v. United States*, 437 U.S. 54, 70 n. 26, 98 S.Ct. 2170,

2182, 57 L.Ed.2d 43 (1978) that "18 U.S.C. § 1955 proscribes any degree of participation in an illegal gambling business, *except participation as a mere bettor*." (Emphasis supplied.)

█ Against the background of the statute and these decisions, what has been earlier indicated becomes apparent, namely that the outcome of this case must hang on whether bets made by third parties to Greco ' and Finn were lay off bets. If they were, the defense concedes that Greco is guilty. If they were not, the government has failed to prove its case and there was insufficient evidence to support the conviction under Count 1. In *United States v. Turzitti*, 547 F.2d 1003, 1006 (7th Cir.), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977), this Court observed, "We understand that not every bet between bookmakers need be a lay off bet." In a similar vein, the Court of Appeals for the Eighth Circuit had previously stated in *United States v. Thomas*, 508 F.2d 1200, 1202 n. 2 (8th Cir.), *cert. denied*, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975), "Bookmakers, however, can and commonly do place personal wagers with one another which are not 'lay off' bets." In another Eighth Circuit case, *United States v. Schaefer*, 510 F.2d 1307 (8th Cir.), *cert. denied*, 421 U.S. 975, 95 S.Ct. 1975, 44 L.Ed.2d 466, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975), a generally accepted *definition* of a lay off bet was offered:

> "[A 'lay off' bet] is a bet or wager placed by one bookmaker with another bookmaker which is necessitated by the influx of an imbalance of bets and wagers on a given sporting event and which has the effect of distributing the said bets and wagers, thus minimizing the risk of substantial loss."

510 F.2d at 1311 n. 5. We hereinabove quoted the government expert's definition of a lay off bet, which the defendant characterizes as "so vague, nebulous, imprecise and intellectually dishonest that we disregard it." Without resorting to such impassioned rhetoric, we hold that the expert's so-called definition was inadequate to the task of assisting the jury. Absent a clear and at least reasonably precise definition of lay off betting, it is difficult to see how this jury could have found that Greco conducted a gambling operation involving the requisite number of persons. Even bets falling within a broad definition of lay off wagering but which were isolated or casual in nature are not sufficient to establish "conduct." *United States v. Milton*, 555 F.2d 1198, 1201 (5th Cir. 1977), *United States v. Thomas*, 508 F.2d at 1206. In *Milton*, the court stated,

> Moreover, bets between bookmakers may be personal wagers that are not lay off bets. On the other hand, evidence of a consistent pattern of lay off betting or exchanging line information between two bookmakers may establish the essential link between them for purposes of Section 1955. (Footnote omitted.)

█ Had this definition, or one of similar import, been made available to the jury in the course of the court's instructions, at least the jury would have had available to it proper standards against which to measure the evidence which the government contends establishes a pattern of lay off betting. However, we need not pass to that consideration (and we similarly recognize that our observation concerning the absence of a definition of lay off betting is not necessary to this opinion), because we conclude that sufficient evidence was not presented to the jury to justify the submission to it of the question: Had Greco been involved in the conduct of a gambling operation with five or more persons?

█ One further contention of the government in this connection requires comment. It points out that Section 1955 makes it a crime for anyone to "finance" an illegal gambling business. After citing dictionary definitions of the term, the government goes on to argue that Greco was financing the operations of his bookmaker customer because immediate payment of lost wagers was not extracted. In support of this contention, the government observes that credit is never extended in legal gambling transactions, and gives as examples of

cash operations betting at racetracks, Las Vegas-type gambling establishments, and the Illinois State Lottery. Clearly, however, there is no occasion to even consider the extension of credit in such operations because all are face-to-face dealings. The intervention of the telephone in the illegal gambling operations with which we here deal presents an entirely different situation, and is one in which the brief extension of limited credit is by definition a necessity. To the degree that such credit extended beyond brief periods and limited amounts, we deem it to have been an accommodation to the parties rather than a "financing" within the meaning of the statute. Incidentally, while the government is of course correct that racetrack betting and state lotteries are strictly cash transactions, the extension of credit by gambling houses, which routinely honor the personal checks and "markers" of preferred customers, is a common practice.

## II

■ Turning to the question of whether the record contains sufficient evidence to sustain the conspiracy conviction under Count 2 of the indictment, we again note that Greco concedes that he was in the gambling business with Charlie Finn. Indeed, in his brief Greco states that his "agreement with Charlie Finn to operate a bookmaking business shreiks from the record," but he goes on to argue that the record is devoid of evidence supporting any claim that he and Finn conspired to violate Section 1955. Greco also argues strenuously that an element of the conspiracy offense included knowledge and intent on his part of the fact that five or more persons would be involved, citing *United States v. Pepe*, 512 F.2d 1129, 1131 (3rd Cir. 1975). However, following the announcement of *United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), the Third Circuit repudiated *Pepe*'s rationale. *See United States v. Johnson*, 514 F.2d 431, 432 (3rd Cir. 1975), and *United States v. Starks*, 515 F.2d 112, 124 (3rd Cir. 1975). We believe the proper rule to be that stated in *United States v. Leon*, 534 F.2d 667, 674 (6th Cir.

1976), which held "that in the case of a conspiracy conviction, it is not essential to show that any defendant knew that the gambling business would involve five or more persons."

■ We find ourselves confronted, however, with a case in a different posture than that considered in *Leon, supra*. In that case it was determined that there was sufficient evidence on the question of the participation of five or more persons in the gambling operation to permit it to go to the jury, and by its verdict the jury necessarily determined the participation of that number of persons. Against that background, *Leon* went on to hold, as noted above, that the alleged conspirators need not know whether five or more persons would be engaged in conducting the gambling business. The participation of five or more persons in the illegal venture was itself circumstantial evidence of an agreement anticipating their participation. In the present case, our conclusion as to the insufficiency of the evidence to establish the five person prerequisite of the Section 1955 charge destroys the underpinning upon which *Leon* rested, and, absent that sufficiency of proof, the conspiracy conviction cannot stand. Thus, the failure of proof which was fatal to the conviction of the substantive charge, also of necessity mortally taints the conviction under the conspiracy charge. We hold that a conviction under Section 371 to violate Section 1955 cannot stand where, as here, there is neither sufficient evidence to support a finding of the participation of the requisite number of persons nor a showing of knowledge or intent on the part of the defendant that such number be engaged in the gambling business.

We observe that this conclusion is entirely consistent with the holding of the Supreme Court in *Feola, supra*. There, where it was established that the victim of an assault was a federal officer, it was held that the defendant's conviction for assaulting a federal officer could stand whether or not the defendant knew that he was an officer. Had the victim in *Feola* not been

shown to be such an officer, or had the evidence in *Leon* been insufficient to show the participation of five or more persons, the situation would have been identical to that in the present case, and it is clear from the rationale of the Supreme Court in *Feola* and of the Sixth Circuit in *Leon* that the conspiracy convictions in those cases would have fallen.

In view of the conclusions hereinabove reached, it becomes unnecessary to consider the further contentions urged by the defendant-appellant, and the judgment of conviction is vacated.