UNITED STATES of America, Plaintiff–Appellee,

v.

Robert William GILLEY, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Benjamin Louis RODRIGUEZ, Defendant–Appellant.

Nos. 86–1174, 86–1175.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1987.

Decided Jan. 11, 1988.

Michael H. Murray, Pleasanton, Cal.; Gary Hall and Jack Anderson, Hunter & Anderson, Oakland, Cal., for defendants-appellants.

Sanford Svetcov and Stephen L. Schirle, Asst. U.S. Attys., Appellate Section, San Francisco, Cal., for plaintiff-appellee.

Before KOELSCH and NOONAN, Circuit Judges, and ROBERT J. BRYAN,* District Judge.

* The Honorable Robert J. Bryan, United States District Judge for the Western District of Washington, sitting by designation.

KOELSCH, Circuit Judge:

During the late spring of 1984, one Robert Lippert informed local agents of the Federal Bureau of Investigations at Oakland, California that he was being harassed by a "bookie" named Robert Gilley and had indeed suffered a physical beating and been threatened with death unless he paid Gilley his gambling debts.

The ensuing investigation resulted in criminal charges being filed against the Appellants Robert Gilley and Benjamin Rodriguez. The indictment, in six counts, is generally as follows [1]:

Count One: that Gilley and Rodriguez during and over a period from October of 1983 to January of 1985 conspired to conduct an illegal gambling business in violation of 18 U.S.C. § 371;

Count Two: that Gilley and Rodriguez during and over the same period did in fact conduct, finance, manage, supervise, direct or own an illegal gambling business in violation of 18 U.S.C. § 1955;

Count Three: that Gilley and Rodriguez during and over a period from April of 1984 to January of 1985 conspired to use extortionate means to collect extensions of credit in violation of 18 U.S.C. § 371;

Counts Four, Five, and Six: that on specified dates, Gilley and Rodriguez used extortionate means to collect extensions of credit in violation of 18 U.S.C. § 894.

A jury trial culminated in verdicts of guilty on all charges against Gilley and on Counts 1, 2, 3 and 6 against Rodriguez,

followed by these appeals from the judgments.

Gilley and Rodriguez challenge their convictions on all counts. They jointly urge insufficiency of the evidence to sustain their convictions, and assign error in the giving and failing to give instructions and in the admission of evidence. Rodriguez alone urges reversal based upon an asserted violation of his Fourth Amendment rights.

We affirm the judgments of conviction on all counts, save count 2. On that count, we reverse and vacate.

## I

When viewed in the favorable light directed by *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1959), the following facts appear:

Gilley was a bookmaker who operated a gambling business in violation of California law during the entire year and a half period charged in the indictment. His business started out as a two-man endeavor operating from the back of his house and ended up operating from a mail center and a public restaurant; at least twelve people were involved at various times throughout.

Even in its infant stages, Gilley's business showed signs of professionalism. Gilley hired a full-time salaried employee, a Daryl Crockett, as a phone clerk; his job was to answer the phones, taking bets from the callers who identified themselves by individual account numbers. From October of 1983 to April of 1984, Crockett

---

1. 18 U.S.C. § 371 provides, in pertinent part:

 If two or more persons conspire either to commit any offense against the United States ..., each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

 18 U.S.C. § 1955 provides in pertinent part:

 (a) Whoever conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling business shall be fined not more than $10,000 or imprisoned nor more than five years, or both.

 (b) As used in this section—

 (1) "illegal gambling business" means a gambling business which—

 (i) is a violation of a State or political subdivision in which it is conducted;

 (ii) involves five or more persons who conduct, finance manage, supervise, direct or own all or part of such business; and

 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2000 in any single day.

 18 U.S.C. § 894 provides in pertinent part:

 (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

 (1) to collect or attempt to collect any extension of credit, or

 (2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

recorded such bets in log books which he turned over to Gilley daily. Taking no risks, Gilley tape recorded the calls to ensure Crockett's accuracy and to settle any disputes over bets placed and debts incurred. During this period, Gilley was backed financially by a man named Paul who called daily to monitor the larger bets that were placed.

The business ripened into its second stage when Gilley moved its headquarters to a mail center nearby. There bettors not only could call by phone to place bets but they also could leave envelopes indicating their bets in their assigned mailboxes. About this time three other participants appeared in the business. "Chuck", also a financial backer, replaced the "first Paul". "Craig" or "Greg" answered the phones on two or three occasions when Crockett was off. And a "second Paul" appeared on the scene. This latter Paul was Paul Budweiser, a middleman who accepted bets on behalf of a layoff bookie[2] named "Fred". The dates of his involvement are unclear, but he definitely was participating by April of 1984 and may have been involved as early as Chuck's replacement of the "first Paul". Not surprisingly, he never met Gilley, the kingpin of this operation, face to face but he accepted bets from Gilley or Crockett over the phone as many as seven and as few as three times per week. He paid Gilley his winnings and collected Gilley's losings by meeting with one of Gilley's three runners. Budweiser met with these runners approximately twenty-four times at three different locations during this relationship.

As with any illegal gambling business, Gilley's operation was not immune from debtors. Just as the nature of his growing business had caused him to find a layoff bookie, so too did it require him to find a collection agent. And he did. Gilley enlisted the aid of his friend, Benjamin Rodriguez, and one of Rodriguez' employees,

Thomas Homan. We know of their involvement from the testimony of the aforementioned Lippert who had incurred an $800 gambling debt in January of 1984. When he failed to pay his debt by early June, which by this time had amassed to $5000 with interest, he began to receive threatening phone calls and was told to call "Ben." The number left turned out to be Rodriguez' place of business. A series of threats followed. When Lippert protested, Gilley threatened to "kick it upstairs." Shortly afterwards, Homan began to visit Lippert in an effort to enforce payment. He made threats of physical violence and of death and in fact did severely beat Lippert on July 23, 1984.

Following this incident Lippert had several discussions with Gilley and Rodriguez both over the telephone and in person at Little Angie's Bar in El Cerrito to discuss his debt. During these conversations, Gilley frequently referred to Rodriguez as his partner and deferred to the latter's proposals regarding the debt and its repayment. The tenor of these conversations was "pay or else."

## II

■ Gilley and Rodriguez first attack the sufficiency of the evidence to sustain their conviction on the conspiracy count (Count 1). For purposes of this appeal, they do not deny that they agreed to operate a gambling business in violation of California law nor do they deny that the business was operated continuously for more than thirty days; rather they argue that there is no sufficient proof, direct or circumstantial, to establish that they knew or reasonably anticipated the involvement of five or more people for upwards of thirty days.

The government takes the position that such proof is unnecessary; that to establish a conspiracy to violate 18 U.S.C.

---

**2.** A layoff bookie is a bookmaker who takes bets from another bookmaker, here Gilley, enabling the latter bookmaker to minimize his financial risk for a given bet by equalizing the amount of bets on each side. *See generally,* Annotation, *Requirement of 18 U.S.C. § 1955 prohibiting il-* *legal gambling businesses, that such businesses involve five or more persons,* 55 A.L.R.Fed. 778, 791 (1981 & Supp.1987) (listing cases where the layoff bookie was included in the jurisdictional five).

§ 1955, the proof need only show an agreement to violate a state gambling statute and an overt act to that end; that the five person/thirty day requirements of subsection (b)(1)(ii) and (iii) apply only to the proof necessary to convict for a violation of the substantive offense.[3]

The government's argument is confused; moreover, it is fallacious.

True the proof need not establish that the alleged conspirators intended to commit or even that they were aware of the substantive offense; however, it must show that they agreed to engage in acts, which, if consummated, would constitute an offense against the United States. *Ingram v. United States*, 360 U.S. 672, 677–78, 79 S.Ct. 1314, 1318–19, 3 L.Ed. 1503 (1959). Here, absent proof that Gilley and Rodriguez knew or reasonably anticipated the involvement of five people, all that can be shown is that their contemplated conduct violates state law.[4] *See United States v.*

*Greco*, 619 F.2d 635 (7th Cir.1980)[5]; *cf. United States v. Bridges*, 493 F.2d 918 (5th Cir.1974) (finding a violation of federal law only where all three elements of the definition of "illegal gambling business" of 18 U.S.C. § 1955(b)(1) have been met); *United States v. Nall*, 437 F.2d 1177 (5th Cir.1971) (reversing conviction for conspiracy to unlawfully transport in interstate commerce stolen securities valuing $5000 or more due to insufficient proof of securities' value).

■ However, and fortunately for the government, it is clear that from the above facts the jury could validly conclude that Gilley and Rodriguez contemplated the involvement of five or more persons for thirty or more days. For example, during November through December 1983, Gilley admits that he and Crockett were continuously involved. Crockett and Budweiser's testimony provide three other participants. There were the financial backers, first Paul, then Chuck. (We count Paul and

---

**3.** The government did not try the case on the alternative theory that the business grossed $2000 on any single day. *See* 18 U.S.C. § 1955(b)(1)(iii); *United States v. Graham*, 534 F.2d 1357 (9th Cir.1976). Nor did the indictment set forth this alternative jurisdictional ground. Accordingly, this opinion discusses the jurisdictional requirements of 18 U.S.C. § 1955 without further mention of this element. For a discussion of what constitutes "gross revenue" under this section, see *United States v. Sacco*, 491 F.2d 995 (9th Cir.1974) (en banc).

**4.** An entirely different situation exists where the prohibited conduct in which they agree to engage is in fact and in law a federal offense. *United States v. Roselli*, 432 F.2d 879, 892 (9th Cir.1970); *see United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). In that case, it is immaterial whether the defendants know that the law which they agreed to break is a federal, not a state law. "Anti-federal intent" is not required. *Feola*, 420 U.S. at 686–96, 95 S.Ct. at 1265–69, *Roselli*, 432 F.2d at 891–92. But here we are confronted with a situation where the defendants argue that there is no proof that the admittedly agreed upon conduct was a violation of federal law. We anticipated such a situation in *Roselli* when we stated,

"[i]t may be argued that because a conspiracy to commit a substantive offense may exist without actual commission of the substantive offense, conspiracies to commit state crimes might be charged under the federal conspiracy laws if there were no need to prove agreement about the aspects of the crime that confer feder-

al jurisdiction. The simple answer is that absent the presence of the jurisdictional element, no charge can be made. The point is not that the jurisdictional element need not exist, but merely that there need be no proof that the defendants were aware of its existence." 432 F.2d at 682.

**5.** The government's attempt to characterize *Greco* as an aberrant decision fails because the cases it cites are inapposite. *See United States v. Balistrieri*, 779 F.2d 1191 (7th Cir.1985); *United States v. Boyd*, 566 F.2d 929 (5th Cir.1978); *United States v. Leon*, 534 F.2d 667 (6th Cir. 1976). In all of them, there was sufficient evidence to support the conviction. Because the conspiratorial agreement may be inferred from the completed act, there was no need to require additional proof of the agreement. We agree with the Seventh Circuit that the proper rule in those cases is that stated in *Leon*, which held that "in the case of a conspiracy conviction, it is not essential to show that any defendant knew that the gambling business would involve five or more persons." *Greco*, 619 F.2d at 640 (quoting *United States v. Leon*, 534 F.2d 667, 674 (6th Cir.1976)). But where the conviction for the substantive offense fails (for any reason), the underpinnings upon which *Leon* rested also fail. *Greco*, 619 F.2d at 640. As discussed later in this opinion, we reverse the convictions for the substantive offense because we could not be sure that the verdict thereon rested on unanimous agreement. Accordingly, we cannot rely on the convictions on count 2 to infer the scope of the conspiratorial agreement.

Chuck only as one of the five because together their activities only served one continuous function for the business.) Budweiser, too, may be included during this entire period in view of his testimony that at the time the business was "busted" in January of 1985 he had been working with Gilley for nearly a year and a half. This time frame is consistent with Crockett's testimony regarding the "second Paul" and with the business' need to layoff bets as the operation became more sophisticated. Budweiser's activity also brought in Fred and at least one of Gilley's runners. It is also not impermissible to count Rodriguez in this period; the jurors may have believed the government's argument that Rodriguez was always a partner and that he just did not become visible until the collection problems arose.

And also consider for another example the period from the end of July through August of 1985. Lippert's testimony shows that Gilley, Rodriguez and Homan were attempting to collect their gambling monies. During this time, Gilley was still employing runners and Budweiser was still accepting layoff bets on behalf of Fred.

■ Proof of the conspiratorial agreement need not be made by direct evidence. Finding here that the evidence sufficiently shows that the business did involve five people for some thirty day period, we find the evidence also sufficient to show that Gilley and Rodriguez entered into the illegitimate agreement as charged and as convicted. Gilley and Rodriguez do not dispute the overt act requirement. We affirm their convictions on Count 1.

### III

■ With respect to the convictions under 18 U.S.C. § 1955 (Count 2), Gilley and Rodriguez attack the adequacy of the jury instructions.[6] They argue the court committed plain error in failing to instruct the jury to unanimously agree upon a particular period of thirty days or more during which five or more persons were continuously involved in the business.[7]

■ Usually a general unanimity instruction suffices. *United States v. Payseno*, 782 F.2d 832 (9th Cir.1986). In *United States v. Echeverry*, 698 F.2d 375 (9th Cir. 1983), *modified*, 719 F.2d 974 (9th Cir. 1983), however, we held that a different rule applies when a "genuine possibility" of juror confusion exists. 719 F.2d at 974. In *Echeverry*, the indictment charged a conspiracy between December, 1980 and June, 1981. The challenged instruction stated,

With respect to Count 1, you must first determine whether the conspiracy charged in that count did in fact exist at least five persons who conduct, finance, manage, supervise, direct or own the business."

But this instruction did not relate to unanimity on the durational requirement; it simply explained the five person requirement to the jury. At the instruction settlement hearing Gilley and Rodriguez disputed the government's position that 18 U.S.C. § 1955 did not require the continuous involvement of five persons during a thirty day period but only that "the operation has to be in operation for thirty days and five people associated with it at some point in time." Tr. April 22, 1986 at 424. In the government's opinion, it would suffice if four people operated such a business for thirty days, and two months later one of those four people dropped out and was then replaced by a newcomer. The Fifth Circuit in *United States v. Gresko*, 632 F.2d 1128 (4th Cir.1980) has held that this is an inaccurate construction of the statute and we agree. To secure a conviction under 18 U.S.C. § 1955, the evidence must establish that during some thirty day period, the business involved a minimum of five people.

---

**6.** Gilley and Rodriguez assign error to the giving of the "layoff bookie" instruction. Our review of the jury instructions given and of the hearings leading to their formulation lead us to conclude that the "layoff bookie" instruction was proposed by the Defendants. Accordingly, the invited error doctrine bars our review of this challenged instruction on appeal. *United States v. Benny*, 786 F.2d 1410, 1416–17 (9th Cir.1986). Defendants also argue that the invited error doctrine has been weakened by *United States v. Gray*, 626 F.2d 494, 501 n. 2 (5th Cir.1980). We find no Ninth Circuit precedent limiting, modifying or otherwise calling into question the validity of our decision in *Benny*, supra, nor do we find reason to do so now.

**7.** The government argues that the invited error doctrine also precludes Gilley and Rodriguez from making this attack because they proposed and the court gave an instruction which reads:

"Title 18 United States Code 1955 prohibits only those gambling operations that involve at all times during some thirty day's periods [sic]

between two or more persons for some period of time, though not necessarily the entire period of time, within the dates charged in the indictment.

Although the case did not involve the traditional concerns of variance of proof, we concluded that the instruction prejudiced the defendant because it generated the possibility that the jury returned a guilty verdict without unanimously agreeing to the facts forming its basis. *Cf. United States v. Mastelotto*, 717 F.2d 1238, 1250 (9th Cir. 1983) (finding plain error in a mail or wire fraud case where the defendants claimed a charging of multiple schemes in each count and it could not be established with certainty that the jurors unanimously agreed on a single scheme). In *Echeverry*, some of the jurors may have found a December conspiracy but not a June conspiracy, while others may have envisioned a June but not a December conspiracy. In that situation, we stated that the jury must unanimously agree on the dates of any conspiracy in which they find the defendant participated. Because "[w]e are not free to hypothesize whether the jury agreed to and was clear on the duration of a single conspiracy or of multiple conspiracies," we reversed the conviction and ordered a new trial.

▇ Although the instant case presents no possibility that the jurors were not unanimous on which crime the Defendants were found guilty, [a situation possible when numerous different conspiracies or acts of extortion are charged in a single count], there is a genuine possibility that the jurors were not unanimous as to the conjunction of two of the material elements of the crime, i.e. the five person/thirty day elements. In the absence of a proper instruction, some jurors, but less than all, for example, could have found that the requisite five people were involved only during the thirty day period from November to December of 1983, while the remaining jurors could have found the involvement only

during the June to July of 1984 period. Because the evidence does not unequivocally show that five people were involved at all times, we cannot say that the guilty verdict rested on unanimous agreement on a single thirty day period.

This is not a case where the case was "sufficiently simple and clear in its presentation that unaninimity can be assumed based on the general instruction." *United States v. Ferris*, 719 F.2d 1405, 1407 (9th Cir.1983).[8] Rather, it is a case involving a sufficiently complex set of facts requiring the judge sua sponte to give a specific unanimity instruction. *Payseno*, 782 F.2d at 837. Indeed, the judge must have recognized this when he gave a specific unanimity instruction regarding the jurisdictional five person requirement. He had stated in his original instructions that the jury must unanimously agree on the identity of the five. When the jury submitted a question during its deliberations, he again gave a specific unanimity instruction: he told them they had to unanimously agree on what an individual had done, whether he had conducted or financed, for example, in order to be included. Although we commend the judge for his cautious and detailed instructions, we conclude that the circumstances warranted a specific instruction on the conjunction of these two elements as well. When the judge responded to the jury's question of the necessity of unanimity on the issue "who did what", he should also have instructed them to unanimously agree upon "who did what when." Under these circumstances, the judge "must augment the general instruction to ensure the jury understands its duty to unanimously agree to a particular set of facts." *Echeverry*, 719 F.2d at 975.

Because the deficiency in the trial judge's instruction prejudiced the defendant's substantial right to a unanimous jury verdict as granted by Article III, § 2, and the Sixth Amendment of the United States

---

**8.** The government's mischaracterization of the law of 18 U.S.C. § 1955, see note 7, infra, caused the lack of specificity at trial of the exact dates of involvement of the numerous alleged participants. Even in his closing argument, the United States Attorney jumbled together the involve-ment of all the characters during the one and a half year period charged in the indictment. It was not until oral argument that the government tried to pin down the involvement of five people during a single thirty day period.

Constitution, we find that plain error occurred. We hold that a conviction for conducting an illegal gambling business as defined in 18 U.S.C. § 1955 cannot stand where the guilty verdict cannot with reasonable certainty be said to stem from a unanimous verdict. Under circumstances such as these, where the indictment charges the operation of an illegal gambling business ranging over a one and a half year period and the evidence does not clearly establish the dates of involvement of the alleged participants, the judge must augment the jury instructions with a specific unanimity instruction not only on the five person requirement but also on the thirty day durational element.

 However and as indicated earlier, the deficiency in the jury instructions does not affect the validity of the conspiracy convictions. Less than unanimous agreement on the particular period in which the five people were continuously involved signifies only that the jury did not unanimously agree that the act [the "illegal gambling business" as defined in 18 U.S.C. § 1955(b)(1) ] was completed. It does not indicate less than unanimous agreement that the act was contemplated. Indeed, a "failure to carry out the conspiracy does not preclude its existence." *United States v. Kearney,* 560 F.2d 1358, 1367 (9th Cir. 1977). Of course, there must be sufficient evidence to sustain the conspiracy. Even if nine jurors believed that the jurisdictional five persons were involved from November to December and the remaining three believed the five persons were involved during the June to July period, all twelve could have agreed from those beliefs at least that Gilley and Rodriguez had intended to operate an illegal gambling business as defined in 18 U.S.C. § 1955(b)(1). We vacate the judgments of conviction on Count 2. The judgments of conviction on Count 1 stands.

## IV

Gilley and Rodriguez contend that the trial court erred when it admitted into evidence two guns. One was found in the glove compartment of Gilley's car along with a cassette tape recorder with a phone recording control device, gambling records, a telephone bill with Budweiser's number on it, and slips of paper with phone numbers on them; the other was found in the master bedroom closet of Rodriguez' home in a shaving kit which also contained four packages of ammunition, a receipt, and a business card with handwriting on the back reading, "I owe $5000 to Ben [Rodriguez] with interest 20 percent, Al Gorman." Gilley and Rodriguez argue that the guns were not relevant and that, even if relevant, that their prejudicial impact outweighed any probative value.

 A trial court has great latitude in the admissibility of evidence. Decisions whether evidence is relevant (Federal Rules of Evidence 401) and whether its probative value outweighs unfair prejudice to the defendants (Federal Rules of Evidence 403) are committed to the court's sound discretion. *United States v. Rubio,* 727 F.2d 786, 798 (9th Cir.1983). We cannot say here that discretion was abused on either the 401 or 403 rulings.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed.R.Ev. 401. *United States v. Cifarelli,* 589 F.2d 180 (5th Cir.1979) is persuasive. There, it appears one Melnick had borrowed a substantial amount of money from Cifarelli at an extortionate rate of interest. Being unable to pay, Melnick was persecuted and threatened by Cifarelli and was beaten by Cifarelli's crony Eberling who "pistol-whipped" him and threatened him with death. A search of Cifarelli's office resulted in seizures of two handguns. The Fifth Circuit held the guns relevant, stating:

[a] review of the evidence showing Cifarelli's own statement that he would kill Melnick if he did not pay the debt, his repeated statements that the persons supplying the money were violent persons, and the telephone conversations between Cifarelli and Eberling clearly threatening violence toward Melnick demonstrate the correctness of the trial

court's ruling on the admissibility of the evidence. *Id.* at 185–86.

So, here, the appellants' possession of handguns tends to show that Gilley and Rodriguez' numerous threats were real and that they had the wherewithal to carry them out. Appellants' attempt to distinguish *Cifarelli* because there a gun was actually brandished is not persuasive. The gun in *Cifarelli* was brandished by Eberling, not Cifarelli. Instead the court relied on other factors, Cifarelli's threats and behavior, to admit the guns against him. Like Cifarelli, Gilley and Rodriguez themselves made threats of violence and of death. Their guns, no less, were found amidst gambling paraphernalia. In light of the nature of Gilley and Rodriguez' threats and activities, the guns were probative of the intent to extort.[9]

Nor did admission of the guns constitute an abuse of discretion because of its potentially prejudicial effect. As already indicated its relevance was abundantly clear and the trial court was careful to give the following limiting instruction on two occasions:

> Some evidence is admitted for only a limited purpose, and this is a limiting instruction. Two guns have been received in evidence. This instruction applies to any gun or any weapons that have or may be received and includes the bullets as well. You must not consider that evidence of bad character of any defendant, but it can only be admitted and its only relevance is as it may relate to the charges for which the defendants are on trial, and its relevance in that regard is entirely up to you as trier of fact.

Such instruction has often been held to protect an accused from undue prejudice in such matters. *E.g. United States v. Marino,* 658 F.2d 1120 (6th Cir.1981).

---

**9.** It is unnecessary to decide whether the "tools of the trade" doctrine, *see United States v. Weiner,* 534 F.2d 15, 18 (2nd Cir.1976), which this and other circuits have sanctioned in narcotics cases generally, *see Kearney,* supra; *United States v. Cresta,* 825 F.2d 538, 554 (1st Cir.1987); *United States v. Payne,* 805 F.2d 1062, 1065–55

**V**

Rodriguez' attack on the validity of the search warrant for his home lacks merit. We have reviewed the supporting affidavits; we cannot say that the magistrate's probable cause determination in issuing the warrant was clearly erroneous. *United States v. Foster,* 711 F.2d 871 (9th Cir. 1983).

We affirm the judgments of conviction on Counts 1, 3, 4, 5 and 6. We reverse and vacate the judgments of conviction of both Appellants on Count 2.

(D.C.Cir.1986); *United States v. Martin,* 794 F.2d 1531, 1533 (11th Cir.1986); *United States v. Sanko,* 787 F.2d 1249, 1251 & n. 6 (8th Cir.1986), is applicable to extortion cases. Where, as here, a clear nexus exists between the evidence and the crime charged, no resort need be made to the "tools of the trade" doctrine.