34 F.3d 1074
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Vidal BELTRAN-PENUELAS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Arturo BELTRAN-FELIX, Defendant-Appellant.
 Nos. 93-10286, 93-10302.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 13, 1994.
Decided Aug. 12, 1994.
 
 Before: FERGUSON, NOONAN, and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Because the parties are familiar with the facts, we do not restate them here. We affirm Vidal's marijuana possession and conspiracy convictions. We also affirm Arturo's conspiracy and possession convictions, but we reverse his CCE conviction because the district court failed to give the jury a unanimity instruction.
 
 
 3
 I. SUFFICIENCY OF EVIDENCE: MARIJUANA CONSPIRACY (ARTURO & VIDAL)
 
 
 4
 Arturo and Vidal contend that there was insufficient evidence to support their convictions for a marijuana conspiracy from 1986 through May 22, 1992, as charged in count 2 of the indictment. They also claim that the Government established the existence of multiple conspiracies, as opposed to a single conspiracy. We reject both arguments.
 
 
 5
 If an indictment charges a single conspiracy, but the evidence reveals multiple conspiracies, the variance may be so prejudicial as to require reversal. United States v. Martin, 4 F.3d 757, 759 (9th Cir.1993). This issue is essentially a sufficiency of the evidence question. Id. In resolving this issue, we must make two inquiries: (1) whether the evidence supports the existence of an overall, single conspiracy, and if it does, (2) whether there is sufficient evidence to connect appellants to that conspiracy.
 
 A. Single Conspiracy
 
 6
 The test to determine whether there was a single conspiracy, as opposed to multiple conspiracies, is "whether there was one overall agreement to perform various functions to achieve the objectives of the conspiracy." United States v. Arbelaez, 719 F.2d 1453, 1457 (9th Cir.1983) (internal quotations omitted), cert. denied, 467 U.S. 1255 (1984). There are four relevant areas of inquiry in determining whether a single conspiracy exists: "the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of times and goals." Id. at 1458 (internal quotations omitted).
 
 
 7
 After reviewing the transcript in this case, we conclude that the evidence adequately supports a finding that a single marijuana conspiracy existed from approximately 1986 through May 1992. See id. at 1457-58 (evidence need not exclude every hypothesis but that of single conspiracy; it is enough if record adequately supports such finding).
 
 
 8
 NATURE OF SCHEME: Arturo and Vidal were engaged in a scheme to distribute marijuana for profit. Duran and Reynoso both testified that they stored marijuana for the Beltrans in six different homes either in Tucson or Phoenix from 1987 through May 1992. Arturo, either alone or with the help of Vidal, would deliver the marijuana for Duran and Reynoso to keep and the Beltrans would then sell the marijuana. Arturo always paid Duran and Reynoso for their assistance.
 
 
 9
 IDENTITY OF PARTICIPANTS: Arturo was at the center of the scheme, supplying the marijuana to others for sale. The record indicates that Vidal was working closely with and at the direction of his father. Duran and Reynoso were also participants who kept the marijuana at various stash houses.
 
 
 10
 QUALITY, FREQUENCY, AND DURATION OF TRANSACTIONS: The evidence established that appellants were deeply involved in the marijuana conspiracy on a consistent basis from at least 1986 through May 1992, as the testimony of Quaill, Duran and Reynoso indicates.[1]
 
 
 11
 COMMONALITY OF TIME AND GOALS: It was apparent that appellants' goal was to make money and they distributed marijuana on a consistent basis.
 
 
 12
 Finally, appellants' argument that the evidence established two separate conspiracies, one as to Duran and Reynoso and another as to the Rex Street residence, is without merit. These were not separate conspiracies. The evidence indicated that Duran and Reynoso were keeping about 108 pounds of marijuana at the Gangley Street residence for the Beltrans. At the same time, Banos was keeping about 530 pounds at the Rex Street residence for Arturo. Moreover, Aguilar testified that Arturo wanted him to deliver the marijuana located at the Rex Street residence to the Ganley Street residence. Arturo promised to pay Aguilar for his assistance, just as he always paid Duran and Reynoso to keep drugs. The evidence does not support a finding that these were two separate conspiracies. Rather, it supports the existence of one conspiracy orchestrated by Arturo who paid individuals for their separate roles in the overall scheme. Given the evidence, a rational jury could have concluded that appellants engaged in a single, overall conspiracy to distribute marijuana.
 
 B. Appellants' Connection to Conspiracy
 
 13
 "Evidence of even a slight connection, if proven beyond a reasonable doubt, is sufficient to convict a defendant of knowingly participating in an established conspiracy." United States v. Mares, 940 F.2d 455, 458 (9th Cir.1991). Moreover, such a connection may be inferred from circumstantial evidence. Id. "It is sufficient to show that each defendant knew or had reason to know of the scope of the conspiracy and that each defendant had reason to believe that his own benefits were dependent upon the success of the entire venture." United States v. Brown, 912 F.2d 1040, 1043 (9th Cir.1990) (internal quotations and brackets omitted) (discussing standard for determining whether defendants are connected to single conspiracy and not multiple conspiracies).
 
 
 14
 The evidence sufficiently established appellants' connection to the conspiracy. The testimony of Duran and Reynoso puts to rest any question of the Beltrans' involvement in a marijuana conspiracy. Arturo was at the center of the conspiracy. He paid his co-conspirators, Duran and Reynoso, for keeping cocaine and marijuana at the stash houses. Arturo informed Duran as to the identities of individuals who would be purchasing drugs and he instructed Duran to deliver the drug money to him.
 
 
 15
 Vidal was also deeply involved in the conspiracy. He assisted in deliveries to the various stash houses and expressed an interest in purchasing marijuana from Aguilar. He attended meetings with his father concerning drug transactions. Specifically, Vidal argues that his mere proximity to the scene of the crime is insufficient to connect him to the conspiracy. Although he is correct in asserting that mere proximity is insufficient to establish the connection, see Mares, 940 F.2d at 458, Vidal was not merely in close proximity to the drug conspiracy. Rather, the evidence indicates that he was an active participant.
 
 
 16
 Quaill testified that when he contacted Arturo about the possibility of obtaining marijuana from him in 1986 or 1987, both Vidal and Arturo discussed the deal with him. Eventually, the Beltrans sold Quaill 300 pounds of marijuana. Duran testified that Vidal consistently helped his father in selling the marijuana that he and Reynoso kept from 1987 through 1992. Unaware that the Rex Street marijuana was his father's, Vidal expressed an interest in purchasing that marijuana when Aguilar told him about it. Vidal even took some of that marijuana to check it out. Aguilar testified that Vidal told him that they were using the Ganley Street residence to store marijuana. Aguilar also testified that he knew Vidal was involved in selling marijuana because Vidal once told him that Vidal's family was "operating very nicely" in trafficking marijuana.
 
 
 17
 Vidal was consistently involved at every stage of this conspiracy. He was more than merely present while the conspiracy was ongoing. Moreover, "acts that otherwise appear innocent, when viewed in context, may support an inference of guilt." Mares, 940 F.2d at 458. The evidence was sufficient to establish both Arturo's and Vidal's connection.
 
 
 18
 II. SUFFICIENCY OF EVIDENCE: POSSESSION (VIDAL)
 
 
 19
 We reject Vidal's contention that there was insufficient evidence to convict him of marijuana possession with intent to distribute, as charged in count 7 of the indictment. Possession with intent to distribute marijuana requires the Government to prove that the defendant knowingly possessed the marijuana with intent to distribute it. See United States v. Walitwarangkul, 808 F.2d 1352, 1353 (9th Cir.) (regarding heroin possession), cert. denied, 481 U.S. 1023 (1987). A conviction for possession may be based upon co-conspirator liability, aiding and abetting, or the exercise of dominion and control over the contraband. Mares, 940 F.2d at 460.
 
 
 20
 We sustain Vidal's possession conviction basedupon the co-conspirator liability. As we previously demonstrated, there was sufficient evidence to establish the existence of a conspiracy and that Vidal was a party to that conspiracy. Arturo, his co-conspirator, possessed the marijuana for purposes of furthering the unlawful distribution scheme.[2] Therefore, Vidal is properly held responsible for possession. See id.
 
 III. QUAILL'S TESTIMONY
 
 21
 Appellants object to our considering Quaill's testimony for any purpose. Quaill's testimony was relevant, in part, to count 3 (a.k.a. "Quaill count") which charged the Beltrans with distributing marijuana in December 1988. The jury acquitted Vidal of that charge. The jury was hung with regard to Arturo and the Government subsequently dismissed the charge against Arturo. Thus, appellants argue, Quaill's testimony is not properly considered in order to sustain the counts against them. We disagree.
 
 
 22
 Appellants cite United States v. Seley, 957 F.2d 717 (9th Cir.1992), in support of their position. Seley is inapposite. Unlike this case, Seley involved an issue of collateral estoppel and whether evidence related to charges for which a defendant was acquitted could be used upon retrial. Id. at 720-21 ("[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."). This case does not involve retrial where the Government is seeking to introduce evidence related to charges for which appellants were acquitted. Appellants cite no other authority in support of their position.
 
 
 23
 We have held that admission of evidence related to counts for which a defendant was not convicted should be reviewed for prejudice. See United States v. Rubio, 727 F.2d 786, 798 (9th Cir.1983) (firearms admitted as evidence on RICO counts for which defendant not convicted constituted minimal prejudice, if any). We find no prejudice here because, even disregarding the Quaill testimony, there is sufficient evidence with which to sustain the appellants' convictions.
 
 
 24
 IV. JURY INSTRUCTION: CCE CONVICTION (ARTURO)
 
 
 25
 Arturo next contends that the district court erred in not giving a unanimity instruction to the jury which would have instructed them that each juror had to agree on the identity of five persons whom Arturo organized, supervised or managed. We agree. A unanimity instruction was neither requested nor given. Because Arturo failed to object to the omission of a unanimity instruction, we review for plain error. United States v. Jerome, 942 F.2d 1328, 1331 (9th Cir.1991).
 
 
 26
 In order to establish that a defendant is guilty of operating a CCE, the Government must show that he engaged in a continuing series of violations of federal narcotics law. Id. at 1330; see also 21 U.S.C. Sec. 848(c) (Supp.1993). The Government must establish two elements: (1) that the "continuing series of violations were undertaken in concert with five or more other persons with respect to whom [the defendant] occupies a position of organizer, a supervisory position, or any other position of management"; and (2) that the defendant obtained substantial income or resources from the continuing series of violations. Jerome, 942 F.2d at 1330 (internal quotations omitted); 21 U.S.C. Sec. 848(c)(2)(A)-(B). It is the five-person requirement with which we are concerned in this case.
 
 
 27
 In Jerome, the Government presented the jury with a variety of people from whom the prosecution told them they could properly count in making the five-person calculation. 942 F.2d at 1331. Some of those individuals were not properly included because they were not organized, supervised or managed within the meaning of Sec. 848(c)(2)(A). Id. Therefore, we held that in such cases, the district court "must give the jurors a specific unanimity instruction--that is the jurors had to be instructed that they must unanimously agree as to the identity of each of the five people [the defendant] organized, managed or supervised." Id. We reasoned that the district court's failure to issue such an instruction "was highly prejudicial, with a high probability of substantially affecting the jury verdict." Id. Even though the defendant had failed to object to the jury instructions, we concluded that the district court's failure to issue the unanimity instruction constituted plain error, and thus we reversed the CCE conviction. Id.
 
 
 28
 Because the Government presented the jury in this case with several individuals not properly included in the five-person calculation, the district court's failure to give the unanimity instruction constituted plain error. Accordingly, Jerome requires us to reverse Arturo's CCE conviction. An "organizer" within the meaning of Sec. 848(c)(2)(A) does not require the Government to prove that the defendant exerted control over those individuals whom he organizes. United States v. Ray, 731 F.2d 1361, 1367 (9th Cir.1984). Rather, the statutory language "or any other position of management" means that an organizer "must exercise some sort of managerial responsibility." Jerome, 942 F.2d at 1331. Nonetheless, "[t]o be an organizer within the sense of the statute more is required than simply being a steady customer." Id. Thus, a defendant's suppliers are not properly counted. Id. We extended Jerome 's reasoning in United States v. Delgado, 4 F.3d 780 (9th Cir.1993), where we held that a defendant's drug customers (as opposed to his suppliers, as in Jerome ) cannot be included in the five-person requirement if the evidence establishes no more than an arm's length buyer-seller relationship. Id. at 787. Instead, the evidence must establish that the defendant exercised managerial responsibility over the individuals at issue. Id. (concluding that defendant's wholesale customers did not qualify under CCE statute).
 
 
 29
 Arturo concedes, and in light of the evidence there can be no doubt, that Duran and Reynoso were properly counted as individuals he managed. Arturo instructed them on where to live, sometimes even locating an available stash house. He had them deliver the drug money they collected to him and he personally paid them for stashing the marijuana and cocaine. Moreover, he instructed them to make two trips to Nogales, Sonora in Mexico to deliver cash.
 
 
 30
 However, despite the Government's protestations to the contrary, we conclude that Chrisantos, Manuelitos, "Gringo # 1," "Gringo in the wheelchair,"[3] and Quaill were not properly included in the five-person calculation. It is evident that Arturo supplied drugs to these individuals; however, the record establishes no more than a buyer-seller relationship. Although the fact that Arturo held a higher position in the chain of distribution than those to whom he supplied drugs may be relevant, that evidence alone is insufficient to establish his position as a manager or organizer. See Delgado, 4 F.3d at 786 ("[S]elling to people does not make one an organizer of customers, even wholesale customers, any more than buying from them makes one an organizer of suppliers.").
 
 
 31
 Similarly, the two Mexican Federal Judicial Police (MFJP) officials (Vidal Moran and Alejandro Mercade), and Manuel Perez were not properly counted. With regard to Moran and Mercade, the evidence establishes a tenuous connection at best and even assuming they were involved, the evidence does not indicate that Arturo managed or organized them.[4] Finally, Aguilar testified that Banos told him Perez sent the marijuana to the Rex Street residence from Sonora. At most, Perez was one of Arturo's suppliers, which under Jerome, is not enough. After reviewing the record, we find that the Government failed to establish that Arturo organized or managed these individuals, and thus, they were not properly counted. See Delgado, 4 F.3d at 787. Because the jury was presented with a variety of individuals, some of whom were not properly counted in the five-person CCE requirement, the district court committed plain error in failing to issue a unanimity instruction. Jerome, 942 F.2d at 1331. Accordingly, we reverse Arturo's CCE conviction.[5]
 
 V. EVIDENCE OF $1.2 MILLION
 
 32
 We reject appellants' argument that the admission of evidence of the $1.2 million seized from the Bronco in which Vidal was a passenger was irrelevant under Fed.R.Evid. 401 and prejudicial under Fed.R.Evid. 403. "Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." United States v. Gilley, 836 F.2d 1206, 1213 (9th Cir.1988) (internal quotations omitted); Fed.R.Evid. 401. The indictment charged appellants with an ongoing conspiracy which operated from about 1986 to May 1992. Evidence of the $1.2 million seizure was relevant to establish that there was an ongoing drug conspiracy in 1990 and that Vidal was involved. Moreover, Vidal told Aguilar that the money was to be used, in part, to pay Christian Peralta, a police commander in Sonora, Mexico. Vidal also told Aguilar that the Beltrans' drug trafficking operation ran smoothly because corrupt customs officials facilitated the crossing of trucks loaded with drugs. The cash was relevant to confirm both the extent and profitability of the Beltran operation.
 
 
 33
 Vidal also objects to its admission because he was merely an innocent passenger in a car carrying a large amount of cash. Nonetheless, the evidence belies that contention. The agents on the case in 1990 testified that the suitcases where the money was found originated from Vidal's house. They saw men loading the suitcases into the Bronco and Agent Conety recognized Vidal at the scene. Furthermore, Vidal told Aguilar that the money was to be paid to Peralta. The fact that Vidal knew the money was to be paid to corrupt officials does not support an inference that he was merely an innocent passenger. We also reject Vidal's argument that because the state money laundering charges, brought as a result of the 1990 seizure, were dismissed, it was improper to permit evidence of the seizure in this case. The fact that those charges were dismissed does not make the evidence irrelevant to this case.
 
 
 34
 We conclude that the district court did not abuse its discretion when it admitted evidence that $1.2 million was seized from the Bronco. See id. ("A trial court has great latitude in the admissibility of evidence."). The evidence made the existence of facts, which the Government was required to prove in establishing its case, more probable than they would have been without the evidence. See Fed.R.Evid. 401. Nor did the district court abuse its discretion in concluding that the probative value outweighed its prejudicial effect.
 
 VI. IDENTIFICATION BADGES & HEARSAY EVIDENCE
 
 35
 We similarly reject appellants' arguments that the district court erred in admitting: (1) badges and documents identifying the driver of the Bronco and a passenger as members of the MFJP because they were not properly authenticated; and (2) hearsay evidence that the driver of the Bronco was a commander of the MFJP; that he was based in Mexico; and that his speciality was narcotics.
 
 A. MFJP Badge and Documents
 
 36
 The district court's decision regarding authentication is reviewed for an abuse of discretion. "The authentication of evidence is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir.) (internal quotations omitted), cert. denied, 112 S.Ct. 164 (1991); see also Fed.R.Evid. 901(a). Even if the badge and identification were not properly authenticated as genuine foreign documents, they were authenticated by the testimony of the officer who stopped the Bronco, Penny Gillette. See id. Rule 901(b) (documents may be authenticated by extrinsic evidence, e.g., testimony of witness with knowledge); see also United States v. Chu Kong Yin, 935 F.2d 990, 995 (9th Cir.1991) (where authentication requirement satisfied under Rule 901, need not determine whether evidence satisfied foreign documents self-authentication requirement under Rule 902(3)). Gillette testified that she found the MFJP badge and identification in a woman's purse in the Bronco. She stated that the man pictured in the identification was the same man who was driving the Bronco. The Government introduced sufficient evidence through Gillette's testimony to establish that the badge and identification were what the Government claimed them to be: documents in the possession of individuals claiming to be members of the MFJP.[6]
 
 B. Hearsay Statements
 
 37
 Appellants next object to the admission of Gillette's hearsay statements that the driver of the Bronco was a commander of the MFJP; that he was based in Mexico; and that his specialty was narcotics. We hold that appellants invited any error. "The doctrine of invited error prevents a defendant from complaining of an error that was his own fault." United States v. Reyes-Alvarado, 963 F.2d 1184, 1187 (9th Cir.), cert. denied, 113 S.Ct. 258 (1992) (defendant who elicits testimony which may violate Bruton cannot later claim error based on that testimony). "Appellants may not seek reversal on the basis of their own evidentiary errors." Id. (internal quotations and brackets omitted).
 
 
 38
 In this case, during Arturo's cross-examination of Gillette, the following exchange occurred:
 
 
 39
 Q: You don't know if ... that person is in fact a Federal officer of the Mexican police?
 
 
 40
 A: He told me that in our conversation while I was filling out the warning.
 
 
 41
 Q: Did he tell you how long he had been a federal officer?
 
 A: No.[7]
 On redirect, the Government asked:
 
 42
 Q: What exactly did he tell you about his identity as a Federal Police Officer in Mexico?
 
 
 43
 A: He told me that he was a commander in the Federal Judicial Police based in Mexico City and that his specialty was narcotics.
 
 
 44
 It is this latter exchange to which appellants object.
 
 
 45
 The damage was done during cross-examination when Arturo elicited testimony establishing that the driver was a member of the MFJP. On redirect, the Government merely confirmed that fact. When Arturo asked if the driver told Gillette how long he had been with the MFJP, Arturo opened the door to the Government's question on redirect. The Government was properly permitted to clarify any confusion after Arturo opened the door. See United States v. Segall, 833 F.2d 144, 148 (9th Cir.1987) (district court did not abuse its discretion in allowing damaging testimony to be elicited on redirect where counsel created false impression and opened the door to such testimony during cross-examination). Therefore, we conclude that the district court did not abuse its discretion in permitting the Government to elicit testimony on redirect which was in response to information revealed during cross-examination. Any error was invited.
 
 VII. ARTURO'S SENTENCE
 
 46
 Finally, Arturo contends that our reversal of the CCE conviction requires us to vacate the conspiracy convictions. This argument lacks merit. Arturo bases his argument on the fact that the district court did not issue alternative sentences as this court suggested in United States v. Medina, 940 F.2d 1247, 1253 (9th Cir.1991). However, Arturo misinterprets Medina. Medina recognizes the dilemma a district court faces when it must sentence a defendant on both CCE and lesser-included conspiracy counts. If the district court itself vacates the conspiracy convictions, and the court of appeals subsequently reverses the CCE conviction, the district court is then powerless to reinstate the lesser-included conspiracy convictions, even though they may be valid. Id. Hence, we devised a suggested course of action for the district court. Medina proposed that in a situation such as the one presented here, the district court should "impose a sentence on the CCE count and an alternative sentence on the lesser-included convictions." Id.
 
 
 47
 Medina recommended the following procedure. The district court should impose a sentence on the CCE count and vacate the lesser-included conspiracy counts, subject to the condition that the CCE count is not reversed on appeal. In the alternative, it should then impose a sentence on the lesser-included counts, conditioned upon a reversal of the CCE count on appeal. Then, depending upon the outcome of the appeal, either sentence could be imposed automatically without requiring remand. Id.
 
 
 48
 In Medina, the CCE conviction was affirmed and the conspiracy convictions were vacated. Because we are reversing the CCE conviction, double jeopardy concerns are no longer implicated, and thus the conspiracy convictions can stand. See id. at 1252-53. Medina 's proposed course of action in no way suggests that should the district court fail to impose alternative sentences, the conspiracy convictions cannot stand if the CCE conviction is reversed. Indeed, the proposed method is more efficient and it merely avoids a needless remand. Id. But, even though the district court did not impose alternative sentences in this case, we are not precluded from affirming the conspiracy convictions even though we are reversing the CCE conviction. The fact that the district court did not employ Medina 's proposed course of action just means that remand is necessary when it would not have otherwise been required had the district court followed the alternative sentencing procedure. Accordingly, we reverse Arturo's CCE conviction (count 1), but we affirm both his conspiracy convictions (counts 2 & 9) and his marijuana possession conviction (count 7).
 
 VIII. CONCLUSION
 A. Vidal
 
 49
 We affirm Vidal's marijuana conspiracy conviction (count 2) and his substantive marijuana possession conviction (count 7).
 
 B. Arturo
 
 50
 We reverse Arturo's CCE conviction (count 1) and affirm both his conspiracy and possession convictions (counts 2, 7 & 9).
 
 
 51
 AFFIRMED in part; REVERSED in part; and REMANDED for resentencing.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Quaill testified that he and the Beltrans met in 1986 or 1987 to discuss the possibility of the Beltrans providing Quaill with marijuana. In 1982, Arturo told Quaill he was interested in having someone of Quaill's caliber to sell cocaine with him
 
 
 [2]
 Arturo does not contest his conviction for possession (count 7) on appeal
 
 
 [3]
 "Gringo # 1" and "Gringo in the wheelchair" were never identified. Although it may not be necessary for the Government to establish the names of individuals in order to include them in the five-person count, we need not decide that issue in this case because these individuals cannot be counted on other grounds. See Delgado, 4 F.3d at 780 (assumed without deciding that unnamed individuals could be counted); see also United States v. Stallings, 810 F.2d 973, 976-77 (10th Cir.1987) (individuals identified only as "Tony" and "Pepe" properly counted)
 
 
 [4]
 Duran testified that on one occasion Mercade delivered a load of cocaine to one of his stash houses. Mercade told him that the cocaine belonged to Arturo. This evidence, without more, establishes that Mercade was a supplier on one occasion which, as previously stated, is insufficient to show that Arturo organized or managed him
 
 
 [5]
 Because we are reversing the CCE conviction on the unanimity instruction ground, we need not examine the other individuals the Government offers as evidence to establish the five-person requirement. We also need not address Arturo's claim that the Government failed to establish the "substantial income or resources" element of the CCE charge because we reverse the CCE conviction on other grounds
 
 
 [6]
 Even assuming the district court erred in admitting this evidence, we conclude that it was harmless error. Given the quantity of evidence against appellants, "it is more probable than not that its admission did not affect the jury's verdict." See United States v. Harrison-Philpot, 978 F.2d 1520, 1527 (9th Cir.1992), cert. denied, 113 S.Ct. 2392 (1993)
 
 
 [7]
 Vidal did not object to this exchange; nor did Arturo move to strike the damaging response